**Stephen KLIM, Plaintiff,**

v.

**Richard JONES, Manager and Marie H. K. Snyder, Proprietor, Junior Tar Hotel, aka, Jr. Tar Hotel, Defendants,**

**California State Hotel and Motel Association, a corporation, Intervenor.**

**Civ. A. No. 52332.**

United States District Court,
N. D. California.
July 17, 1970.

Richard M. Sims, III, San Francisco, Cal., Geoffrey H. Freedman, San Diego, Cal., Michael S. Sorgen, San Francisco, Cal., for plaintiff.

F. Campagnoli, San Francisco, Cal., for defendants.

John P. McFarland, Harry L. Kuchins, Jr., McFarland & Kuchins, San Francisco, Cal., for intervenor.

Opinion and Order Granting Plaintiff's Motion for Partial
Summary Judgment

GERALD S. LEVIN, District Judge.

## I. STATEMENT OF THE CASE

This action arises from plaintiff's complaint to enjoin the violation of plaintiff's civil rights, for damages, and for declaratory relief, filed on September 30, 1969. Plaintiff now moves for partial summary judgment declaring California Civil Code § 1861[1] (Innkeeper's

---

1. Section 1861 provides:

"Hotel, motel, inn, boardinghouse, furnished apartment house and lodginghouse keepers shall have a lien upon the baggage and other property belonging to or legally under the control of their guests, boarders, tenants, or lodgers which may be in such hotel, motel, inn, or apartment, boarding or lodging house for the proper charges due from such guests, boarders, tenants, or lodgers, for their accommodation, board and lodging and room rent, and such extras as are furnished at their request, and for all money paid for or advanced to such guests, boarders, tenants, or lodgers, and for the costs of enforcing such lien, with the right to the possession of such baggage and other property until such charges and moneys are paid; and unless such charges and moneys shall be paid within 60 days from the time when the same become due, said hotel, motel, inn, furnished apartment house, boardinghouse or lodginghouse keeper may sell said baggage and property at public auction to the highest bidder, after giving notice of such sale by publication of a notice containing the name of the debtor, the amount due, a brief description of the property to be sold, and the time and place of such sale, pursuant to Section 6064 of the Government Code in the county in which said hotel, motel, inn, furnished apartment house, boardinghouse or lodginghouse is situated and also by mailing at least fifteen (15) days before such sale, a copy of such notice addressed to such guest, boarder, tenant, or lodger at his post office address, if known, and if not known, such notice shall be addressed to such guest, boarder, tenant, or lodger at the place where such hotel, motel, inn, furnished apartment house, boardinghouse or lodginghouse is situated; and after satisfying such lien out of the proceeds of such sale together with any reasonable costs that may have been incurred in enforcing said lien, the residue of said proceeds of sale, if any, shall upon demand made within six months after such sale, be paid by said hotel, motel, inn, furnished apartment house, boardinghouse, or lodginghouse keeper to such guest, boarder, tenant, or lodger; and if not demanded within six months from the date of such sale, such residue shall be paid into the treasury of the county in which such sale took place; and if the same be not claimed by the owner thereof, or his legal representatives, within one year thereafter, the same shall be paid into the general fund of said county; and such sale shall be a perpetual bar to any action against said hotel, motel, inn, furnished apartment house, boardinghouse or lodginghouse keeper for the recovery of such baggage or property or of the value thereof, or for any damages growing out of the failure of such guest, boarder,

Lien Law) unconstitutional in that it permits the taking of property without due process of law. More specifically, plaintiff points to the fact that under Section 1861, all of a boarder's [2] personal property may become subject to the innkeeper's lien prior to any hearing on the matter.

## II. FACTUAL BACKGROUND

The plaintiff works irregularly as a painter and has been so engaged for more than fifteen years. He has limited financial means and was receiving cash aid from the Department of Social Services of San Francisco on an emergency basis at the time this action was filed.

From about August 15, 1969, until September 15, 1969, plaintiff was a boarder in the Junior Tar Hotel, 3143–16th Street, San Francisco, California. During that time the rent was $10.00 per week, payable on the Friday of each week. Plaintiff paid the rent due either in cash or by doing painting work on the rooms of the Junior Tar Hotel itself.

On Friday, September 19, 1969, defendant Jones awakened plaintiff in the latter's room at about twelve noon. Defendant Jones informed plaintiff that rent was due and owing, but plaintiff claimed that he did not owe any rent. Defendant Jones then proceeded to padlock plaintiff out of his room and informed plaintiff that his personal belongings, now locked away from plaintiff, would be returned if plaintiff paid him $5.00 (the amount of the rent allegedly due and owing).

When defendant Jones padlocked plaintiff's room, all of plaintiff's personal belongings were still inside. These belongings included the following: one pair of overalls, other personal clothing and underwear, painting tools, an electric frying pan, a coffee pot, a lamp, and personal papers including plaintiff's driver's license, birth certificate, Navy transcript, and bank book.

In order to remedy the situation, plaintiff contacted a counselor with the Northern California Service League who in turn referred plaintiff to an attorney. On Friday, September 26, 1969, plaintiff

tenant, or lodger to receive such baggage or property; provided, however, that if any baggage or property becoming subject to the lien herein provided for does not belong to the guest, lodger, tenant, or boarder who incurred the charges or indebtedness secured thereby, at the time when such charges or indebtedness was incurred, and if the hotel, motel, inn, furnished apartment house, boarding or lodginghouse keeper entitled to such lien receives notice of such fact at any time before the sale of such baggage or property hereunder, then, and in that event, such baggage and property which is subject to said lien and did not belong to said guest, boarder, tenant, or lodger at the time when such charges or indebtedness was incurred shall not be subject to sale in the manner hereinbefore provided, but such baggage and property may be sold in the manner provided by the Code of Civil Procedure for the sale of property under a writ of execution, to satisfy a judgment obtained in any action brought to recover the said charges or indebtedness.

"In order to enforce the lien provided for in this section, a motel, hotel, inn, furnished apartment house, boardinghouse, and lodginghouse keeper shall have the right to enter peaceably the premises used by his guest, boarder, lodger, or tenant in such hotel, motel, inn, furnished apartment house, boardinghouse, or lodginghouse without liability to such guest, tenant, boarder, or lodger for conversion, trespass, or forcible entry. An entry shall be considered peaceable when accomplished with a key or passkey or through an unlocked door during the hours between sunrise and sunset.

"This section does not apply to:

"1. Any musical instrument of any kind or description which is used by the owner thereof to earn all or a part of his living.

"2. Any prosthetic or orthopedic appliance personally used by a guest, boarder, tenant, or lodger."

2. The term "boarder" will be used in this opinion as synonymous with and instead of the group of terms, "guests, boarders, tenants or lodgers" referred to in Section 1861.

and his attorney returned to the Junior Tar Hotel. Plaintiff asked defendant Jones if he could obtain his belongings, and defendant Jones refused. Defendant Jones said that nothing would be returned until plaintiff paid him twelve dollars. Plaintiff and his attorney then left the hotel.

Plaintiff wanted his belongings so that he could work. Plaintiff also needed his various personal papers so that he could identify himself for employment.

Plaintiff then filed the complaint herein seeking a declaratory judgment that California Civil Code § 1861 is unconstitutional; an injunction against the enforcement of Section 1861 as against the plaintiff; a temporary restraining order causing defendants to return the padlocked property; and damages in the sum of $12,000.00 for deprivation of personal property, interference with employment opportunities, battery, and for infliction of mental and emotional distress.

Thereafter, defendant Jones returned to plaintiff his personal belongings.

## III. PROCEDURAL PROBLEMS

Before turning to the merits of the controversy the court must first resolve several procedural issues that have been presented.

### A. *Three-Judge Court*

Plaintiff filed a motion for the convening of a Three-Judge Court pursuant to 28 U.S.C. § 2281 [3] et seq. simultaneously with the filing of his complaint. Following the required certification by this court to the Chief Judge for the

Ninth Circuit Court of Appeals, said Three-Judge Court was convened. Before proceeding, however, a question was raised respecting the propriety of such convening, and the parties were requested to brief the matter. Following the submission of written arguments on the matter and extensive oral argument by the parties on May 20, 1970, the judges of the Three-Judge Court entered an order filed May 27, 1970, dissolving the Three-Judge Court.[4] Accordingly, this court has proceeded as a regularly-constituted one-judge district court. *See generally* D. Currie, "The Three-Judge District Court in Constitutional Litigation," 32 U.Chi.L.Rev. 1, 14 (1964).

Because the Three-Judge Court proceeding is cumbersome and dislocates the normal operating pattern of the federal courts, a Three-Judge Court may be convened pursuant to 28 U.S.C. § 2281 only in a limited class of cases and only when all the requirements of that statute are met. Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941). *See also* Mitchell v. Donovan, 398 U.S. 427, 90 S.Ct. 1763, 26 L.Ed.2d 378 (1970). One of the requirements of Section 2281 is that the injunction sought thereunder operates to restrain a state officer from enforcing the law sought to be challenged. Wilentz v. Sovereign Camp., 306 U.S. 573, 579–580, 59 S.Ct. 709, 83 L.Ed. 994 (1939); Ince v. Rockefeller, 290 F.Supp. 878, 881 (S.D. N.Y.1968); Hinton v. Threet, 280 F. Supp. 831, 835 (M.D.Tenn.1968); Comment, "The Three-Judge Federal Court in Challenges to State Action," 34 Tenn.L.Rev. 235, 242 (1967).

---

3. Section 2281 provides:
   "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is

heard and determined by a district court of three judges under section 2284 of this title."

4. Whether the matter under consideration is required to be heard by a statutory Three-Judge Court is a question which said Court can decide. Jackson v. Department of Public Welfare of State of Fla., 296 F.Supp. 1341, 1342 (S.D.Fla. 1968); Note, "Three-Judge District Courts: Some Problems and a Proposal," 54 Corn.L.Q. 928, 940 (1969).

■ Although numerous cases have relaxed this requirement by authorizing the convening of a statutory Three-Judge Court when an injunction is sought to restain a *local officer* from performing a function embodying a policy of statewide concern or where the issue involved has statewide application,[5] no case was cited by the parties nor discovered by the court's research wherein a statutory Three-Judge Court was convened where neither a state nor a local officer was sought to be restrained. Because no such state or local officer has been named as a defendant or is sought to be restrained here, this is not a case to be properly heard by a statutory Three-Judge Court.

### B. *Jurisdiction*

Plaintiff asserts two grounds upon which the jurisdiction of this court may be founded. The first ground is under the Civil Rights Act, 28 U.S.C. § 1343[6] and 42 U.S.C. § 1983, and the second is under federal question jurisdiction pursuant to 28 U.S.C. § 1331.

Section 1983 is the main jurisdictional ground asserted by plaintiff and it reads as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The problem posed by Section 1983 under the facts of this case is the familiar one concerning the definition and scope of "under color of" state law. One commonly used definition of this phrase was given by Justice Stone in United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941):

"Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." [Citations omitted.]

See also Screws v. United States, 325 U.S. 91, 109, 65, S.Ct. 1031, 89 L.Ed. 1495 (1945); D. Alfange, Jr., " 'Under Color of Law': Classic and Screws Revisited," 47 Corn.L.Q. 395 passim (1962).

As a result, action by state officials such as law enforcement personnel acting in an official capacity will generally be "under color of" state law, while action by private individuals without any sort of state sanction or encouragement has been held not to constitute action taken "under color of" state law. Problems arise when Section 1983 is sought to be applied to conduct falling in the gray zone between solely state and solely private involvement.

The Supreme Court has made it clear that Section 1983 does not operate only against state officers, but rather that

---

5. E. g., Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322 (1935); Bell v. Waterfront Commission of New York Harbor, 279 F.2d 853 (2d Cir. 1960); Valtierra v. Housing Authority of San Jose, 313 F.Supp. 1 (N.D. Cal.1970); Lazarus v. Faircloth, 301 F. Supp. 266, 270 (S.D.Fla.1969); Hyden v. Baker, 286 F.Supp. 475, 481 (M.D. Tenn.1968); Dyer v. Rich, 259 F.Supp. 736, 739 (N.D.Miss.1966).

6. 28 U.S.C. § 1343 reads in pertinent part:
   "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

   \*　　\*　　\*　　\*　　\*

   "(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;"

   \*　　\*　　\*　　\*　　\*

private individuals may also be liable thereunder if a sufficient enough involvement with the state is shown. In United States v. Price, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966) the Court held that,

> "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents." [Footnote omitted.]

The gray zone under section 1983 was further circumscribed by Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), a case upon which plaintiff has placed great reliance. In *Reitman* the Supreme Court upheld a decision of the California Supreme Court which held unconstitutional a clause of the California Constitution prohibiting the state from denying a private individual the right to sell property to whomever he might choose. The Supreme Court found that state involvement violative of the Fourteenth Amendment could exist even where the state was charged only with encouraging, rather than commanding, discrimination. It is noteworthy that both the plaintiffs and the defendants in *Reitman* were private individuals not connected with the state and that no state personnel were involved even indirectly. In fact, the only state involvement at all was the enactment of the statute in question by the California legislature. See Kletschka v. Driver, 411 F.2d 436, 447 (2d Cir. 1969); United States v. Cantrell, 307 F.Supp. 259, 267 (E.D. La.

1969); McCain v. Davis, 217 F.Supp. 661, 666 (E.D. La. 1963).

■ The *Reitman* case is a clear authority on which to find the defendants herein amenable to jurisdiction under Section 1983. Not only does California Civil Code § 1861 outline the conditions applicable to the lien in question here, but it is *only* by virtue of Section 1861 that defendant Jones had the power to impose a lien on the plaintiff's belongings, and it is *only* by virtue of Section 1861 that defendant Jones could impose such lien without subjecting himself to the forms of civil liability excluded by Section 1861.[7] This is not just action against a backdrop of an amorphous state policy, but is instead action encouraged, indeed only made possible, by explicit state authorization.

This result is further supported by a Supreme Court case decided while the present action was pending, Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), rev'g 409 F.2d 121 (2d Cir. 1968). Although the primary question under consideration by the Court in *Adickes* was the meaning of the phrase "under color of * * * custom or usage of any state" as contained in Section 1983, a considerable portion of both the majority and concurring opinions was spent in analyzing the history and role of Section 1983 as well as the scope of state involvement necessary for jurisdiction thereunder. Justice Harlan writing for the majority concluded by noting that "a state is responsible for the discriminatory act of a private party when the State, by its own law, has compelled the act." 398 U.S. at 170, 90 S.Ct. at 1615.

---

**7.** Section 1861 as amended provides the California innkeeper with exemptions from liability for conversion, trespass, and forcible entry under certain conditions. These exemptions are in derogation of the innkeeper's common law liability as well as that theretofore existing in California. See Jordan v. Talbot, 55 Cal. 2d 597, 603, 609–610, 12 Cal.Rptr. 488, 361 P.2d 20 (1961) (landlord's liability for forcible entry); Van Dorn v. Couch, 21 Cal.App.2d (Supp.) 749, 753–755, 64 P.2d 1197 (1937) (landlord's liability for forcible entry); Price v. Hovsepian, 114 Cal.App.2d 385, 387, 250 P.2d 252 (1952) (landlord's liability for conversion); Pearl v. Figoni, 49 Cal.App.2d 662, 663, 122 P.2d 385 (1942) (landlord's liability for conversion). See also discussion in text, *infra*.

Justice Brennan, concurring in part and dissenting in part, took an even broader view of Section 1983:

> "Thus, when private action conforms with state policy, it becomes a manifestation of that policy and is thereby drawn within the ambit of state action." 398 U.S. at 203, 90 S.Ct. at 1626.

> \* \* \* \* \* \*

> "A private person acts 'under color of' a state statute or other law when he, like the official, in some way acts consciously pursuant to some law which gives him aid, comfort, or incentive.

> \* \* \* \* \* \*

> "In view of the purposes these remedies [28 U.S.C. §§ 1983, 1985, 1986] were designed to achieve, § 1983 would be read too narrowly if it were restricted to acts of state officials and those acting in concert with them." 398 U.S. at 212, 90 S.Ct. at 1631.

In light of the increasingly liberal view of the meaning of "under color of" state law as evinced by *Reitman* and *Adickes*, it seems clear that conduct such as that which forms the heart of the present action is properly the subject of suit brought under Section 1983.

The only other obstacle to finding jurisdiction under Section 1983 in the present action stems from a view taken by some courts that the Civil Rights Act applies only to "personal rights" and not to "property rights." Other courts have either rejected this distinction outright or avoided its effect by characterizing the "property" claim in question in terms of such non-property concepts as denial of due process or equal protection of the laws. Even if the "property rights-versus-personal rights" distinction be accepted, it will not bar the plaintiff's claim in the present action since his claim is not for "mere" property, but rather for property which is his means of employment and support and hence incapable of pecuniary measure. *See* Willis v. Reddin, 418 F.2d 702, 703 (9th Cir. 1969); Penn v. Stumpf (N.D.Cal.1970) 308 F.Supp. 1238, 1245–1246, and cases cited therein. *See also* Note, "The 'Property Rights' Exception to Civil Rights Jurisdiction—Confusion Compounded," 43 N.Y.U.L.Rev. 1208 passim (1968).

■ The plaintiff's complaint states facts which would also support jurisdiction under the alternative basis of 28 U.S.C. § 1331 (federal question jurisdiction), which reads in pertinent part:

> "(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

A few cases have suggested that a claim properly cognizable under Section 1983 is also cognizable, *ipso facto*, under Section 1331. Landry v. Daley, 280 F. Supp. 929, 934 (N.D.Ill.1967), app. dism. per curiam, 393 U.S. 220, 89 S.Ct. 455, 21 L.Ed.2d 392 (1968); Klor v. Hannon, 278 F.Supp. 359, 362–363 (C.D. Cal.1967); Lucero v. Donovan, 258 F. Supp. 979, 980–981 (C.D.Cal.1966). This approach is presumably based on the view that the phrase "Under color of" [state law] in Section 1983 has been treated the same as "state action" within the meaning of the Fourteenth Amendment (and hence forming a basis for a "federal question" under Section 1331). See United States v. Price, *supra*, 383 U.S. at 794 n. 7, 86 S.Ct. 1152.

While it is true that many sets of facts would give rise to jurisdiction under both Section 1983 and Section 1331, this is not invariably so, and certain fact situations could well support jurisdiction under Section 1983 but not under Section 1331. One explanation for this divergence is the long-engrafted rules concerning federal question jurisdiction under Section 1331 which might not be entirely applicable to Section 1983 proceedings. Another explanation is that despite the statement in the *Price* case, *supra*, at least one Supreme Court justice does not regard the statutory term "under color of" state law to be as broad as the constitutional concept of "state action." *See* Justice Brennan's opinion

in *Adickes, supra*, 398 U.S. 144, 90 S.Ct. 1598.

■ Section 1331 illustrates the necessity for complying with the long-established federal rule of the "well-pleaded complaint": in order for an action to arise under federal law within the meaning of Section 1331, the plaintiff must show affirmatively on the face of the complaint that jurisdiction exists, without the aid of the answer or in anticipation of a federal question to be raised by way of defense, no matter how certain the latter may be. Pan Am Petroleum Corp. v. Superior Court, 366 U.S. 656, 663, 81 S.Ct. 1303, 6 L.Ed.2d 584 (1961); Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 672–673, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); Gully v. First Nat. Bank, 299 U.S. 109, 112–116, 57 S.Ct. 96, 81 L.Ed. 70 (1936); Louisville & Nashville R.R. v. Mottley, 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908); State of Tennessee v. Union and Planters' Bank, 152 U.S. 454, 459–460, 14 S.Ct. 654, 38 L.Ed. 511 (1894); Metcalf v. Watertown, 128 U.S. 586, 589, 9 S.Ct. 173, 32 L.Ed. 543 (1888); Osborn v. United States Bank, 9 Wheat. (22 U.S.) 738, 824, 6 L.Ed. 204 (1824); 2 Moore's Federal Practice ¶ 2.07[2] at 396; C. Wright, Law of Federal Courts 51–53 (1963); E. London, " 'Federal Question' Jurisdiction—A Snare and a Delusion," 57 Mich.L.Rev. 835, 846 (1959); 32 Am.Jur.2d Federal Practice and Procedure § 70 at 481, § 73 at 484. Although several commentators have criticized this approach to federal jurisdiction,[8] it remains the accepted rule today.

The question here is whether the plaintiff's complaint is sufficient on its face to reveal federal question jurisdiction under Section 1331 insofar as it alleges a taking of property without due process of law, or whether the complaint merely states a request for the return of property with the federal question coming in only by way of defense. Although *Louisville & Nashville R.R., supra*, can be interpreted as authority to the contrary, a long line of cases after *Louisville & Nashville R.R.* support the view that a complaint alleging the taking of the plaintiff's property without due process within the terms of the Fourteenth Amendment states a sufficient cause of action to afford jurisdiction under Section 1331. E.g. White v. Sparkill Realty Corp., 280 U.S. 500, 50 S.Ct. 186, 74 L.Ed. 578 (1930); South Covington, & C. St. Ry. Co. v. Newport, 259 U.S. 97, 99–100, 42 S.Ct. 418, 66 L. Ed. 842 (1922); Township of River Vale v. Town of Orangetown, 403 F.2d 684, 685 (2d Cir. 1968); City of Miami v. Woolin, 387 F.2d 893, 894 (5th Cir. 1968); Miller v. County of Los Angeles, 341 F.2d 964 (9th Cir. 1965); Screven County v. Brier Creek Hunting & Fishing Club, 202 F.2d 369, 371 (5th Cir. 1953), cert. den. 345 U.S. 994, 73 S.Ct. 1136, 97 L.Ed. 1402 (1953); Crystal Springs Land & Water Co. v. City of Los Angeles (C.C.S.D.Cal.) 76 F. 148, 154, aff'd, 177 U.S. 169, 20 S.Ct. 573, 44 L.Ed. 720 (1900); Hilliard v. Commonwealth of Pennsylvania, 308 F.Supp. 756, 757–758 (W.D.Pa.1970); Katz v. State of Connecticut, 307 F.Supp. 480, 482 (D.Conn.1969); Town of East Haven v. Eastern Airlines, Inc., 282 F. Supp. 507, 515 (D.Conn.1968); Sandsberry v. Gulf, C. & S. F. Ry. Co., 114 F. Supp. 834, 838 (N.D.Tex.1953); Republic Acceptance Corporation v. De Land, 275 F. 632, 635 (E.D.Mich. 1921); Northern Texas Telephone Co. v. City of Sherman, Tex., 4 F.Supp. 554, 557 (E.D.Tex.1933).

---

8. C. Wright, op. cit. at 48–55; D. Currie, "The Federal Courts and the American Law Institute," 36 U.Chi.L.Rev. 268, 269 (1969); W. Cohen, "The Broken Compass: The Requirement That a Case Arise 'Directly' under Federal Law," 115 U.Pa.L.Rev. 890 passim (1967); G. Fraser, Jr., "Some Problems in Federal Question Jurisdiction," 49 Mich.L.Rev. 73, 79–81 (1950); J. Chadbourn and A. Levin, "Original Jurisdiction of Federal Questions," 90 U.Pa.L.Rev. 639, 663, 674 (1942); R. Forrester, "The Nature of a 'Federal Question,' " 16 Tulane L. Rev. 362, 367, 374, 385 (1942).

The federal question asserted by plaintiff under Section 1331 is, of course, an alleged taking of property without due process of law as is prohibited by the Fourteenth Amendment. As with Section 1983, the Fourteenth Amendment speaks only to "state action" and does not apply to purely private conduct. *See Adickes, supra,* 398 U.S. 144, 90 S.Ct. 1598, Swank v. Patterson, 139 F.2d 145, 146 (9th Cir. 1943), and cases cited therein; 32 Am.Jur.2d Federal Practice and Procedure § 51 at 460; 13 A.L.R.2d 390 Anno.: Federal Courts—Constitution, § 22 at 465.

If, as the *Price* case, *supra,* indicates, "under color of" state law is in all respects equal to "state action," then the *discussion above as to* the applicability of Section 1983 will also suffice to make Section 1331 applicable. If Justice Brennan's view that "state action" is broader than "under color of" state law be followed, then the result is more obvious still.

The court concludes, therefore, that jurisdiction in the present case is properly founded on either 28 U.S.C. § 1343 and 42 U.S.C. § 1983, or on 28 U.S.C. § 1331.

### C. *Mootness*

█ Intervenor has contended that this action is moot by reason of the defendants' having returned to plaintiff his belongings upon which the lien of Section 1861 attached. If the only relief prayed for by plaintiff were to secure the return of his property, then this action might indeed be moot. Here, however, the plaintiff has prayed for additional relief in the form of money damages. Since any such recovery depends in part upon a determination by this court that the defendants acted pursuant to an unconstitutional statute, this action is not rendered moot by the return of the plaintiff's belongings. *See* Powell v. McCormack, 395 U.S. 486, 496–497, 499, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); Richey v. Wilkins, 335 F.2d 1, 6 (2d Cir. 1964). *Cf.* United States v. Concentrated Phosphate Export Assn., 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); Heilberg v. Fixa, 236 F.Supp. 405, 407 (N.D.Cal.1964), aff'd Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); United States v. W. T. Grant Co., 345 U.S. 629, 632–633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Boggess v. Berry Corporation, 233 F.2d 389, 391, 16 Alaska 256 (9th Cir. 1956). *See generally* Note, "Mootness on Appeal in the Supreme Court," 83 Harv.L.Rev. 1672 passim (1970).

### D. *Abstention*

█ Intervenor has also suggested that even if this court has proper subject matter jurisdiction in this action, it should nevertheless stay its hand and defer to the state courts of California for a determination as to the constitutionality of California Civil Code § 1861. The Supreme Court has repeatedly held that exhaustion of available state remedies is not a prerequisite to the maintenance of an action in the federal courts under the Civil Rights Act,[9] so the only possible basis on which this court may decline to decide the case before it is on the theory of abstention.

The abstention doctrine, first outlined in any detail in Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), is based on notions of comity rather than of jurisdiction. While its main thrust has been to permit state courts to adjudicate matters within their competency and thus avoid state-federal friction, absten-

9. Damico v. California, 389 U.S. 416, 417, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); McNeese v. Board of Education, 373 U.S. 668, 671, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 180–183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Reichenberg v. Nelson, 310 F.Supp. 248, 251 (D.Neb.1970); Note, "Exhaustion of State Remedies under the Civil Rights Act," 68 Col.L.Rev. 1201, 1202 (1968).

tion only sanctions "escape" in a narrow class of special circumstances, and as a result has come to be regarded with increasing disfavor by the federal courts. *See* Zwickler v. Koota, 389 U.S. 241, 248–249, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Allegheny County v. Frank Mashuda Co., 360 U.S. 185, 188, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959); United States v. Nogueira, 403 F.2d 816, 821 (9th Cir. 1968); Bartholomew v. Port, 309 F.Supp. 1340, 1342 (E.D.Wis. 1970); Goldman v. Knecht, 295 F.Supp. 897, 901 (D.Colo.1969); Wilke & Holzheiser, Inc. v. Reimel, 266 F.Supp. 168, 171 (N.D.Cal.1964); Note, "Federal-Question Abstention: Justice Frankfurter's Doctrine in an Activist Era," 80 Harv.L.Rev. 604, 607 (1967). Special circumstances have been found to exist, for example, where the state statute under scrutiny was only recently enacted and not yet interpreted by any state court. Albertson v. Millard, 345 U.S. 242, 244, 73 S.Ct. 600, 97 L.Ed. 983 (1953). *See also* Baggett v. Bullitt, 377 U.S. 360, 376–377, 84 S.Ct. 1316, 12 L. Ed.2d 377 (1964); Harrison v. N.A.A. C.P., 360 U.S. 167, 176, 79 S.Ct. 1025, 3 L. Ed.2d 1152 (1959). Abstention has also been held proper when the issue was whether, as a matter of state law, an ordinance was properly enacted, Chicago v. Fieldcrest Dairies, 316 U.S. 168, 171–172, 62 S.Ct. 986, 86 L.Ed. 1355 (1942); or whether, under state law, a statute in question was applicable at all, Spector Motor Service Co. v. McLaughlin, 323 U.S. 101, 105–106, 65 S.Ct. 152, 89 L.Ed. 101 (1944).

On the other hand, abstention is improper where there is before the court no controlling question of state law, that is where no skein of state law must be disentangled, *McNeese, supra,* 373 U.S. at 674, 83 S.Ct. 1433, or where there is no ambiguity in the state law calling for interpretation by state courts. Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Chicago v.

Atchison, T. & S. F. R. Co., 357 U.S. 77, 84, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958); Bramlett v. Peterson, 307 F. Supp. 1311, 1321 (M.D.Fla.1969); Note, "Exhaustion of State Remedies under the Civil Rights Act," *supra* at 1205–1206.

■ In view of the approach to abstention expressed in the above cases, this court can see no good reason why it should abstain from deciding a case properly and clearly before it. California Civil Code § 1861 is not a new statute nor does it appear to be ambiguous in its terms or applicability. Even a cursory glance at any California case law citator reveals that Section 1861 has been the subject of litigation over a span of many years, which litigation has helped to establish the limits and function of Section 1861. To make the parties repair to the state courts to begin anew would only involve substantial and unwarranted delay and expense and would not, it is submitted, result in a different decision in light of the principles of federal law controlling her. *See* Chicago v. Atchison, *supra* 357 U.S. at 84, 78 S.Ct. 1063.

## IV. MERITS

### A. *Innkeepers and the Innkeeper's Lien*

Houses of public entertainment and accommodation have been maintained in all countries from early times. Inns existed throughout the ancient civilized world and were the forerunners of the inns, motels, hotels and the like of the modern day.[10]

The first legal system to deal with inns and innkeepers was that of the Roman law. Dating from the Praetor's Edict, it was the law of ancient Rome that shipmasters, innkeepers, and stable keepers had to restore what they received to keep safe, or they would be penalized by the law.[11] Most commentators have construed this to place upon the

10. Beale on Innkeepers and Hotels § 1 at 1 (1906).

11. N. Cournoyer, Introduction to Hotel and Restaurant Law 7 (1968).

Roman innkeeper an absolute duty to keep safely those possessions of his guests which came properly into his inn,[12] and it is from this duty that the later analogous strict duty of the Medieval English innkeepers sprang.[13]

The common law principles of the innkeeper's legal status stemmed from the conditions existing in England at the time when such principles were formulated in the fourteenth and fifteenth centuries. Although a considerable amount of traveling occurred, the roads were bad and often passable only on foot or horseback. In addition to poor roads, the medieval traveler had also to contend with highwaymen and outlaws who infested the forests through which the roads passed. So long as the travelers proceeded in groups, there was little likelihood of an attack during daylight, but at night the danger was considerable.[14]

As a result of these conditions the medieval traveler carried with him as little baggage as possible and obtained his food and shelter for the night at an inn. There he was compelled to place his property with an unknown host who might prove unworthy of his trust. At the inn the traveler's property would ordinarily be committed to the care of servants over whom the guest had little or no control, and witnesses to whom he might turn in the event of loss would ordinarily favor the innkeeper.[15] To safeguard the traveler under these conditions and provide him with an effective remedy against a breach of trust by the innkeeper or his servants, there developed in England a custom of the realm which made the innkeeper absolutely liable for the full value of the property of his guest committed to him for safekeeping.[16] The only generally recognized exceptions to this absolute liability were in those cases where the loss was caused by the negligence or fraud of the guest, by an act of God, or by a public enemy.[17] This rule of absolute liability was the common law rule governing an innkeeper's duties and remained such until modified or limited by legislation.[18]

Concomitant with this rule of absolute liability was the duty imposed upon the innkeeper to accept into the inn as guests all who might properly apply for lodging and to accept for safekeeping their possessions as well (with a few exceptions)[19] For a breach of his duty

---

12. Cournoyer at 7; Schouler's Bailments and Carriers § 287 at 297 (1887).

13. Redfield on Carriers and Other Bailees 433 (1869). Cournoyer, however, regards the influence of Roman law on the laws of innkeeping as not altogether clear. Cournoyer at 7.

14. G. Navagh, "A New Look at the Liability of Inn Keepers for Guest Property under New York Law," 25 Ford.L. Rev. 62, 62–63 (1956), citing Beale § 3 at 3.

15. *Id.* at 63.

16. *Id.*

17. *Id.*; Richardson on Bailments § 130 at 75 (6th ed. 1937); P. Van Zile, Bailments and Carriers § 349 at 343 (2d ed. 1908).

18. Gardner v. Roosevelt Hotel, 175 Misc. 610, 24 N.Y.S.2d 261, 262–263 (City Ct. Trial T.1940) rev'd on other grounds, 176 Misc. 546, 28 N.Y.S.2d 78 (Sup.Ct. App.T.1941); Briggs v. Todd, 28 Misc. 208, 59 N.Y.S. 23, 24 (Supp.Ct.App.T. 1899); Federal Insurance Co. v. Waldorf-Astoria Hotel, 60 Misc.2d 996, 303 N.Y.S.2d 297, 299 (Civ.Ct.1969); Beale § 174 at 123; Goddard's Outlines of the Law of Bailments and Carriers § 181 at 76-77 (1904); E. Beal, Law of Bailments 304–305 (1900); Lawson on Bailments § 76 at 130 (1895); Comment, "Bailments—Innkeepers—Liability for Loss of Baggage," 30 Mich.L.Rev. 1107 (1932).

19. Richardson §§ 127–128 at 74; Oliphant's Law of Horses 216–217 (6th ed. 1908); Van Zile § 343 at 333; J. Beale § 61 at 42; Goddard § 175 at 71; E. Beal 294–295; Lawson § 73 at 127–128; S. Wandell, Law of Inns, Hotels and Boarding Houses 46–48 (1888); Schouler § 318 at 327; Redfield § 575 at 437. A rather charming account of the origin and scope of the innkeeper's common law duties can be found in R. Rogers, Jr., The Law of Hotel Life 1–18 (1879).

to receive guests the innkeeper would be liable in tort,[20] and for a breach of his duty to safeguard the guest's possessions he would be liable in assumpsit or breach of an implied contract or in conversion and trover.[21]

The duty to receive the guest and his goods coupled with the duty of absolute liability for the safety thereof placed an onerous burden on the medieval innkeeper. In view of such great responsibility there developed at common law an accompanying principle also based on the custom of the realm: that the innkeeper would have a lien on the property of his guest for the innkeeper's reasonable and just charges made to the guest.[22] Except for the clothes and other possessions on his person, the common law innkeeper's lien extended to all types of property of the guest entrusted into the safekeeping of the innkeeper.[23]

The common law innkeeper's lien is the origin of the lien now available, pursuant to statutory enactments in many jurisdictions, to proprietors of such establishments as inns, guest houses, boarding houses, lodging houses, apartment houses, motels, and hotels.[24]

## B. *Due Process and the Innkeeper's Lien*

The California version of the innkeeper's lien as codified in California Civil Code § 1861 grants to the proprietors of several types of establishments a lien virtually coextensive with that existing at common law. Although the reasons underlying the need for such lien have largely passed from the scene, the "innkeeper" in California still retains his older and almost unfettered power under the lien statute. Furthermore, despite recent Supreme Court decisions respecting the due process rights of individuals as expressed in such cases as Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), the victim of the lien provided for in Section 1861 has no greater rights than he would have had half a millennium ago.

The first reason for altering the method of imposition of the innkeeper's lien is grounded in fundamental jurisprudence: when the reason behind a rule disappears, so should the rule. Although our present society is far from idyllic, it is nonetheless true that the days of violence and unpredictable condi-

---

20. Thomas v. Pick Hotels Corporation, 224 F.2d 664, 666 (10th Cir. 1955); Van Zile § 345 at 337–340; J. Beale § 282 at 198–199; Wandell at 48–49; H. Jeremy, Law of Carriers 146 (1816).

21. J. Beale § 282 at 199; Wandell 89. *See* Price v. Hovsepian, 114 Cal.App.2d 385, 387, 250 P.2d 252 (1952).

22. Most cases and treatises have regarded the innkeeper's right to detain as based upon the custom of the realm—and that alone. This custom sprang from the innkeeper's duty to receive the guest and his goods along with his absolute liability for the safety thereof. J. Hogan, "The Innkeeper's Lien at Common Law," 8 Hast.L.J. 33, 43 (1956). *See also* Van Zile § 350 at 347–348; E. Beal 322; Wandell at 178; Jeremy at 148; T. Tylor, "The Innkeeper's Lien," 7 Md.L.Rev. 154 (1944); Comment, "Constitutional Law—Due Process of Law—Innkeeper's Lien—Appellate Jurisdiction," 22 Geo. L.J. 101, 102 (1933); Note, "Innkeeper's Lien," 9 Harv.L.Rev. 216 (1895).

23. J. Beale at § 255 at 178–179.

24. The common law rules applicable to inns have been held likewise applicable to hotels and kindred establishments in the United States. Cournoyer at 11; Richardson § 116 at 67; J. Beale § 22 at 23; Scanlan at 15; Wandell at 15; R. Lee, "Liens on Personal Property Not Governed by the Uniform Commercial Code," 44 No.Car.L.Rev. 322, 349 (1966). Statutes such as California Civil Code § 1861 have, however, expanded the coverage of the common law lien to certain types of establishments not entitled thereto under the common law rules. Thus both lodging houses and boarding houses, were not within the coverage of the common law innkeeper's lien, Beal at 292; Hogan at 36, but both are within the coverage of Section 1861.

tions which spawned the innkeeper's common law liability do not pose the threat to travelers they once did. In recognition of this fact, the overwhelming number of jurisdictions in the United States, including California, have forsaken the older common law rule of absolute liability for one based only on the duty to use reasonable or ordinary care.[25] Accordingly, to whatever extent a summary procedure was necessary to make the innkeeper's lien equal in scope to his potential liability, that liability has been so reduced as to no longer call for such a draconian approach as dictated by Section 1861.

The second reason calling for a reevaluation of Section 1861 is this court's firm belief that that statute, as presently drawn, is violative of the constitutional guarantee of due process of law as outlined in the *Sniadach* case, *supra*.

In *Sniadach* the Supreme Court, through the majority opinion of Justice Douglas, declared unconstitutional a Wisconsin statute which permitted prejudgment wage garnishment (and hence the taking of property) without due process of law in the form of fair notice and a prior hearing. Justice Douglas noted that summary procedure might be permissible in certain extraordinary situations, as where special protection for a state or creditor interest was necessary, but that such procedure was unwarranted by the situation presented in *Sniadach*.

Justice Douglas focused searchingly on the specific facts before the Court in saying, "We deal here with wages—a specialized type of property presenting distinct problems in our economic system." *Id.* at 340, 89 S.Ct. at 1822. Justice Douglas went on to enumerate some of the hardships posed by the garnishment procedure under the Wisconsin statute. Garnishment of wages before judgment often costs the garnishee his job and was a great drain on his family income. Such garnishment further permitted abuses where the claimed debt was fraudulent and was saddled on a poverty-stricken and ingenuous person. And such garnishment gave the garnishing creditor undue economic leverage and provided for exemptions too small to support the debtor for any one week. *Id.* at 340–341, 89 S.Ct. 1820.

Justice Douglas then found the statute unconstitutional for failing to provide the required due process safeguards, concluding,

"The result is that a prejudgment garnishment of the Wisconsin type may as a practical matter drive a wage-earning family to the wall. [Footnote omitted.] Where the taking of one's property is so obvious, it needs no extended argument to conclude that absent notice and a prior

25. E. g., Cain v. George, 411 F.2d 572, 573 (5th Cir. 1969) ; Guss v. Jack Tar Management Company, 407 F.2d 859, 860 (5th Cir. 1969) ; Adams v. Powell, 351 F.2d 273, 274 (10th Cir. 1965) ; Darter v. Greenville Community Hotel Corporation, 301 F.2d 70, 77 (4th Cir. 1962), aff'g 194 F.Supp. 642 (W.D.S.C.1961) ; Bowling v. Lewis, 261 F.2d 311, 313–314 (4th Cir. 1958) ; Hotel Dempsey Co. v. Teel, 128 F.2d 673, 674 (5th Cir. 1942) ; Baker v. Dallas Hotel Co., 73 F.2d 825, 827 (5th Cir. 1934) ; De Honey v. Harding, 300 F. 696, 699 (8th Cir. 1924) ; Clancy v. Barker, 131 F. 161, 163, 165 (8th Cir. 1904) ; Early v. John A. Cooper Company, 304 F.Supp. 906, 907–909 (W.D. Ark.1969) ; Carson v. Squirrel Inn Corporation, 298 F.Supp. 1040, 1043 (S.C. 1969) ; Waugh v. Duke Corporation, 248 F.Supp. 626, 629 (M.D.N.C.1966) ; Hadden v. McLaughlin, 237 F.Supp. 209, 211 (E.D.S.C.1965) ; Dove v. Lowden, 47 F. Supp. 546, 548 (W.D.Mo.1942) ; Chase v. Beard, 55 Wash.2d 58, 62, 346 P.2d 315 (1959) ; Stowe v. Fritzie Hotels, Inc., 44 Cal.2d 416, 421, 282 P.2d 890 (1955) ; Topley v. Zeeman, 216 Cal. 182, 185–186, 13 P.2d 666 (1932) ; Goldstein v. Healy, 187 Cal. 206, 211, 201 P. 462 (1921) ; Wallace v. Speier, 60 Cal.App.2d 387, 391, 140 P.2d 900 (1943) ; Schlemmer v. Stokes, 47 Cal.App.2d 164, 167, 117 P.2d 396 (1941) ; Adams v. Dow Hotel, 25 Cal.App.2d 51, 53–54, 76 P.2d 210 (1938) ; Richardson § 129 at 75 ; Comment, "Negligence—Innkeepers—Liability for Loss of or Injury to Goods of Guest," 6 Tex.L.Rev. 545, 546 (1928) (Texas) ; 18 A.L.R.2d 973, 974–975 Anno.: Innkeeper—Liability to Guest (1951).

hearing * * * this pre-judgment garnishment procedure violates the fundamental principles of due process." *Id.* at 341–342, 89 S.Ct. at 1822–1823.

Justice Harlan concurred in a separate opinion in which he expressed the view that the property being deprived under the facts of *Sniadach* was the *use* of the garnished portion of the debtor's wages. For Justice Harlan the guiding principle was that,

"Since this deprivation cannot be characterized as *de minimis*, she must be accorded the usual prerequisites of procedural due process: notice and a prior hearing." *Id.* at 342, 89 S.Ct. at 1823.

Although recent court opinions have left in doubt whether *Sniadach* was based strictly on due process grounds or whether it was more concerned with the particular type of property discussed there,[26] this court regards *Sniadach* as standing inescapably on constitutional principles. Even were this not the case, and even if *Sniadach* were restricted to situations involving such economic hardships as were created by the garnishment of wages, it is clear from the discussion hereafter that Section 1861 posits a situation at least as destructive if not more so than that posed by pre-judgment garnishment.

■ Section 1861 is constitutionally infirm under *Sniadach* for its failure to provide for any sort of hearing prior to the imposition of the innkeeper's lien thereunder, thus depriving the boarder of property without due process of law. As the Supreme Court recently reaffirmed in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287

(1970), the main ingredient of due process is the opportunity to be heard, and Section 1861 provides no such timely opportunity. The courts of California have already recognized and applied the salutary principles expressed in *Sniadach* in several cases. *See*, e.g., In re Harris, 69 Cal.2d 486, 489–490, 72 Cal. Rptr. 340, 446 P.2d 148 (1968); Mendoza v. Small Claims Court, 49 Cal.2d 668, 672, 321 P.2d 9 (1958); People v. Broad, 216 Cal. 1, 3–8, 12 P.2d 941 (1932); Mihans v. Municipal Court, 7 Cal.App.3d 479, 87 Cal.Rptr. 17, (1st App.Div. Div. 1 1970, Molinari, J.). In McCallop v. Carberry, 1 Cal.3d 903, 904, 83 Cal.Rptr. 666, 464 P.2d 122 (1970), the Supreme Court of California bowed to the ruling of *Sniadach* and declared unconstitutional its own state pre-judgment wage attachment statute insofar as it failed to provide the procedural safeguards called for by *Sniadach*.

Focusing on the evils peculiar to wage garnishment discussed by Justice Douglas in *Sniadach*, this court also finds Section 1861 infirm for the deleterious effect it has on the lives of those to whom it applies. More specifically, the lien procedure of Section 1861 strikes with a greater impact than the analogous procedures under the Wisconsin statute invalidated in *Sniadach* in at least the following ways:

First, although Section 1861 applies as well to the thousands of more affluent patrons who stay at California's better lodging facilities, its primary impact appears to be on those who, like the plaintiff here, are either financially embarrassed or of extremely limited means. It is obvious that many of those who habituate hotels and rooming facilities of lesser light and who would be most op-

26. As of the date of the present opinion the highest courts of two states have split when faced with the question of extending *Sniadach* to attachment of property other than wages. Compare Larson v. Fetherston, 44 Wis.2d 712, 172 N.W.2d 20, 23 (1969) (applying *Sniadach* to garnishment of other forms of property since "a due process violation should not depend on the type of property being subjected to the procedure") with Termplan Inc. v. Superior Court of Maricopa Co., 105 Ariz. 270, 463 P.2d 68, 70 (Ariz.1969) (refusing to extend *Sniadach* to property other than wages). The highest court of California had this problem before it in advisory form and accordingly declined to rule thereon in People ex rel Lynch v. Superior Court, 1 Cal.3d 910, 912, 83 Cal. Rptr. 670, 464 P.2d 126 (1970).

pressed by the procedure under Section 1861 are even less able to withstand such procedure than are wage-earners under prejudgment wage garnishment statutes. Many such boarders have no steady or significant source of income, much less regular wages.

Second, wage garnishment applies only to wages and only to a portion thereof, thus leaving the debtor's other property unencumbered. Under Section 1861, however, *all* of the boarder's possessions may be denied him if such possessions are all kept in his lodgings. With the probable exceptions of motels and inns, in each of the other rooming establishments covered by Section 1861 it is altogether likely that the occupant thereof keeps all his worldly goods there. This was the case with the plaintiff here, and nothing has been presented to this court to indicate that such is not a common situation.

Third, the lien of Section 1861, much like garnishment of wages, may well result in the loss of a boarder's job. This effect is exacerbated when, as in the present case, the imposition of a lien under Section 1861 denies the boarder access to his very tools of trade or other means of livelihood. In addition, the boarder will not even have access to personal identification papers, credentials, licenses and the like if these, too, are left in his quarters when the lien of Section 1861 is imposed.

Fourth, the lien procedure countenanced by Section 1861 results in economic leverage on the boarder at least as great as that stemming from the application of wage garnishment statutes. Here, too, the imposition of the lien may often result in dubious or fraudulent claims being paid by the harried boarder with valid legal defenses being relegated to the dustbin.[27]

Fifth, and finally, Section 1861 provides for virtually no exemptions from its coverage, unlike the wage garnishment statutes in effect even before *Sniadach*. Section 1861, by its own terms, exempts only musical instruments used to earn a living and prosthetic or orthopedic appliances personally used by the boarder. While California attachment statutes provide for numerous exemptions, as for such obvious necessities as tools of trade, furnishings, and clothes, Section 1861 makes almost none.[28] Without such exemptions, Section 1861

---

27. Without any judicial interposition between claim and imposition of the lien, Section 1861 permits self-help tactics not generally favored by the courts. As counsel for the plaintiff has suggested, Section 1861 effectively clothes the California innkeeper with the badge of the sheriff and the robes of the judge.

The problems inherent in permitting the innkeeper alone to decide at the outset whether the boarder owes him rent raises an objection similar to that once noted by an English court which rejected the proposition that the innkeeper's lien attaches to the person of the guest as well as his goods:

"The proposition [that one might be imprisoned for life for failing to pay the debt owed an innkeeper] is monstrous. Again, if he have any right to detain the person, surely he is a judge in his own cause: for he is then the party to determine whether the amount of his bill is reasonable, and he must detain him until the man brings an action against him for false imprisonment, and then if it were determined that the charge was not reasonable, and it appeared that the party had made an offer of a reasonable sum, the detainer would be unlawful." Sunbolf v. Alford, 3 M. & W. 248, 1 H. & H. 13, 7 L.J.Ex. 60, 2 Jur. 110 (1838), cited in J. Beale § 257 at 181.

28. Compare California Civil Code § 1861a, the analogous lien statute for keepers of unfurnished apartment houses, apartments, cottages, or bungalow courts. In addition to those items likewise exempted under Section 1861, Section 1861a also provides for the following exemptions:

"(c) Table and kitchen furniture, including one refrigerator, washing machine, sewing machine, stove, bedroom furniture, one overstuffed chair, one davenport, one dining table and chairs, and also all tools, instruments, clothing and books used by the tenant or guest in gaining a livelihood; beds, bedding and bedsteads, oil paintings and drawings drawn or painted by any member of

thrusts the allegedly defaulting boarder out onto the street without any possessions other than what he can manage to carry on his person. The two limited exemptions which are provided by Section 1861 bear little relationship to any rational policy and would seem to be aimed only at protecting people such as Benny Goodman and the late President Franklin D. Roosevelt.

In view of these harsh effects, the only possible way in which Section 1861 might be saved would be to find that it served some overriding "state or creditor interest" as expressed in *Sniadach*. No paramount state interest has been claimed before this court, and it does not appear that any such state interest is served by Section 1861. It is argued, however, that a significant creditor interest does exist, for without the innkeeper's lien the California proprietor would be unable to get in personam jurisdiction over the transients who often frequent California motels, hotels, and the like.

The court is not persuaded by this argument. The boarder who desires to leave the jurisdiction without paying his bill can easily do so and take all his possessions with him, so the threat of a lien is hardly an iron-clad safeguard for the California proprietor. A more practical consideration is that many if not most of the establishments which have resort to the lien of Section 1861 cater to lodgers who stay for significant periods of time, so the danger of a non-paying transient leaving the state just to avoid a lodging bill does not seem to be at all common.

The final point to be made here is that the innkeeper will not be left to the mercy of lodgers by the instant decision. The court is not purporting to abolish the innkeeper's lien, but only to require that it be conditioned by the procedural due process safeguards discussed by the Supreme Court in *Sniadach*. Moreover, a feasible if not entirely attractive alternative exists by which the California proprietor can guarantee that he will be paid, namely payment in advance. Innkeepers have long had the right to require payment in advance before receiving a guest.[29] and nothing prevents today's innkeeper from doing the same.

In declaring Section 1861 unconstitutional for the reasons expressed, this court reaches a result contrary to that reached many years ago by the only other court which squarely faced the issue presented to this court today. In 1933 the Supreme Court of Missouri declared in L. E. Lines Music Co. v. Holt, 332 Mo. 749, 60 S.W.2d 32 (1933) that a Missouri statute declarative of the common law innkeeper's lien was not unconstitutional as a violation of due process. See Comment, 22 Geo.L.J. 101, 102, *supra*.

The present result, however, seems inescapable in view of the teaching of *Sniadach*. Accordingly, this court grants plaintiff's motion for summary judgment and declares California Civil Code § 1861 unconstitutional insofar as it fails to provide for a hearing prior to the imposition of the lien pursuant thereto.

---

the family of the tenant or guest, and any family portraits and their necessary frames.

"(d) All other household, table, or kitchen furniture not expressly mentioned in paragraph (c), included but not limited to radios, television sets,

phonographs, records, motor vehicles * * *.

29. Cournoyer at 407; J. Beale § 244 at 170; Scanlan at 38; Schouler § 326 at 333.