Marvin LEBOWITZ, Plaintiff,

v.

**FORBES LEASING AND FINANCE CORPORATION** (a foreign corp.), Benjamin Ogurek, Orchid Farales, Network Cinema Corporation and Jerry Entman, Defendants.

Civ. A. No. 71–369.

United States District Court,
E. D. Pennsylvania.

April 15, 1971.

As Amended April 19, 1971.

Henry A. Stein, Mesirov, Gelman, Jaffe & Levin, Philadelphia, Pa., for plaintiff.

Lawrence Silver, Dilworth, Paxson, Kalish, Levy & Coleman, Philadelphia, Pa., for defendants.

### OPINION AND ORDER

EDWARD R. BECKER, District Judge.

#### I. STATEMENT OF CASE

We are here confronted with a challenge to the validity of the Pennsylvania foreign attachment procedure on post-*Sniadach* due process grounds. Sniadach v. Family Finance Corp.[1] is the landmark case holding that, absent notice and a prior hearing, the Wisconsin pre-judgment garnishment procedure in which a summons was issued at the request of a creditor's lawyer, and the lawyer, by serving a garnishee, set in motion machinery whereby wages were frozen in the interim before trial of the main suit without any opportunity on the part of a wage-earner to be heard or to tender any defense he might have, violated fundamental principles of due process.

---

1. 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

*Sniadach's* seed has been scattered by the winds. It has spawned the downfall of:

1. the California[2] and Arizona[3] wage garnishment statutes, in addition to Wisconsin's;

2. the New York replevin statute;[4]

3. the California innkeeper's lien law;[5]

4. the Pennsylvania statutes relating to distress for rent[6] and confession of judgment;[7]

5. the Minnesota general garnishment statute;[8] and

6. the California statute relating to landlords' writs of immediate possession.[9]

In the wake of these precedents, a constitutional attack upon Pennsylvania foreign attachment, a similar prejudgment garnishment proceeding not limited to wages, was to be expected.

■ It comes before us on a motion of defendant Forbes Leasing and Finance Corporation ("Forbes") to quash the foreign attachments perfected by plaintiff Marvin Lebowitz ("Lebowitz") in the Court of Common Pleas of Philadelphia County prior to removal of the case to this Court on the grounds of diversity of citizenship. We refuse to quash the foreign attachments. However, because the case has been a difficult one for us, and because it is on the frontier of a rapidly developing field of law,

we have set forth not only our reasons for denying the motion, but also our views as to countervailing considerations which we consider to be of substance, in considerable detail.[10]

## II. THE FACTUAL SETTING

On January 27, 1971, Lebowitz commenced an action in equity against Forbes and the other defendants in the Court of Common Pleas of Philadelphia County. On February 1, 1971, Lebowitz caused a writ of foreign attachment to issue pursuant to and under color of the Pennsylvania Rules of Civil Procedure against Forbes. The attachment claimed an amount of $200,000 and was served upon the Girard Trust Bank and the First Pennsylvania Banking and Trust Company as garnishees. In accordance with the Pennsylvania Rules, the attachments were effected without notice to Forbes or a hearing. The report of the Girard Bank showed that it had custody of monies due Forbes in the amount of $71,672.61, and First Pennsylvania's report showed that it had custody of monies due Forbes in the sum of $4,-293.34.

On February 16, 1971, the action was removed to this Court on the ground of diversity between the parties, and the motion to quash the foreign attachments followed. Forbes is a Delaware Corporation, with principal offices in New York, not registered to do business in Penn-

2. McCallop v. Carberry, 1 Cal.3d 903, 83 Cal.Rptr. 666, 464 P.2d 122 (1970).

3. Termplan Inc. v. Superior Court, 105 Ariz. 270, 463 P.2d 68 (1969).

4. Laprease v. Raymours Furniture Co., 315 F.Supp. 716 (N.D.N.Y.1970).

5. Klim v. Jones, 315 F.Supp. 109 (N.D.Cal. 1970).

6. Santiago v. McElroy, 319 F.Supp. 284 (E.D.Pa.1970).

7. Swarb v. Lennox, 314 F.Supp. 1091 (E.D. Pa.1970), probable jurisdiction noted, 401 U.S. 991, 91 S.Ct. 1220, 28 L.Ed.2d 529 (March 29, 1971).

8. Jones Press, Inc. v. Motor Travel Services, Inc., 286 Minn. 205, 176 N.W. 2d 87 (1970).

9. Mihans v. Municipal Court, 7 Cal.App.3d 479, 87 Cal.Rptr. 17 (1970).

10. While pondering the solution of the constitutional claim it became necessary to consider whether it was necessary to request the convening of a three-judge court pursuant to 28 U.S.C. § 2281, since the constitutionality of rules of procedure, statutory in origin (see Pa.Stat., tit. 12, § 2861 et seq. (1967)) of statewide applicability is involved. However, we conclude that, since the case involves a controversy between two private parties, neither of which is a state or even local officer, the three-judge court statute is not applicable. In support, see Klim v. Jones, 315 F.Supp. 109 (N.D.Cal.1970).

sylvania; however, at all times relevant hereto, Forbes maintained an office in Philadelphia. Forbes filed a general appearance. Subsequent to filing the motion, Forbes filed an answer and counterclaim.

The factual background which may be gleaned from the well-pleaded facts, is essentially as follows. Lebowitz had engaged in business as a financial consultant with particular experience, reputation and contacts in the field of equipment lease financing. Defendant Network is in the business of franchising the operation of mini theaters in various parts of the country. Defendant Entman is a principal of Network. Lebowitz entered into an employment agreement with Forbes, a wholly-owned subsidiary of Network to be formed in Pennsylvania providing that he would become President of Forbes and would engage in business under that name. His principal duty was to obtain financial commitments for the benefit of Network. The salary arrangement included a bonus based upon profits, an expense account, and an option to purchase Forbes' stock. A further agreement between Lebowitz and Network provided that Lebowitz was to obtain certain funding commitments for Network, in return for which he was to receive stock options.

The gravamen of the complaint is the allegation that, after obtaining extensive financial commitments for Network, Lebowitz was circumvented by the defendants, acting in concert, who allegedly conspired to use the line of credit obtained by Lebowitz for their own benefit, in disregard of the written agreements. The Complaint also alleges that Lebowitz was dispossessed from his offices, that his employment contract was wrongfully terminated, and that he received no compensation for the financial commitments obtained by him and converted to defendants' use. The damages claimed are considerably in excess of $150,000.00.[11]

Defendant's answer avers that Lebowitz breached his agreement by (1) failing to devote full time to his duties; (2) converting the assets and credit of Forbes to his own use; and (3) failing to deliver satisfactory financial commitments. The answer further avers that the employment contract was terminated for cause. The counterclaim asserts damages in the sum of $25,000.

On March 18, 1971, we heard extensive argument on the motion to quash and have considered the parties' excellent briefs.

## III. FOREIGN ATTACHMENT—ITS ANCIENT LINEAGE AND THE METAMORPHOSIS FROM A PROCEDURE TO COMPEL APPEARANCE TO PRE-JUDGMENT EXECUTION.

Full understanding of the case before us requires an historical orientation. Our search into the origins of foreign attachment indicates that attachment of the property of a defendant to hold it pending the outcome of litigation over a debt allegedly due the plaintiff was unknown at early common law. It had its origin in the law merchant. Select Cases on the Law Merchant [12] describes an attachment issuing out of the merchants' court at the Fair of St. Ives in 1287. According to Glenn, Fraudulent Conveyances and Preferences,[13] attachment "floated into the common law world by means of that estuary of the law merchant which was called the custom of London." The custom was ultimately brought to the colonies and in most of them became part of the common law. In Pennsylvania, the custom was introduced by statute [14] and called foreign attachment.

11. The Complaint includes a prayer for equitable relief which the parties agree is now moot.

12. 73 Selden Society 228.

13. § 37, at 64.

14. The first statute was enacted in 1699. *See* Lobinger, Archaic Legal Procedure, 60 Pitt.Leg.J. 449 (1912).

The Pennsylvania cases recognize that attachment practice follows the custom of London.[15]

An excellent description of the custom of London and the early authorities describing the same is found in J. Patton, Foreign Attachment in Pennsylvania.[16] It appears therefrom that the process of attachment was originally intended merely to compel the appearance of the defendant by sufficient sureties to answer plaintiff's demand upon him. Patton refers to the writings of R. Woolsey in the Doctrine and Practice of Foreign Attachment in the Mayor's Court, London, 23 (1816), where it is said:

"The process of attachment seems, therefore, in its origin, to have been originally intended merely to compel the appearance of the defendant by sufficient sureties to answer the plaintiff's demand upon him. It was justly considered that the merchants of a great mercantile city would have debtors resident in foreign countries with no means (unless by their property here), of rendering them amenable to our courts of justice. The process of attachment was, therefore, probably devised; and hence, in our common-law books, it is styled Foreign Attachment. But it may be remarked, that in the language of the city courts, all non-freemen are styled foreigners." [17]

The law of foreign attachment became crystallized in Pennsylvania in the Foreign Attachment Act of 1836.[18] This Act, together with its amendments and supplements, the Fraudulent Debtor's Attachment Act of 1869, as amended,[19] the Domestic Attachment Act of 1836,[20] and the Attachment of Vessels Act of 1836 and its supplements,[21] constitute the law of attachment in Pennsylvania. The final stage in the development of the law governing attachments in Pennsylvania took place in 1954, when the Rules of Civil Procedure took over much of the regulation of the attachments formerly governed by the statutes referred to above.[22] This was accomplished by the adoption of Rules of Civil Procedure expressly regulating the subjects of foreign attachment and fraudulent debtor's attachment.[23] At the same time, the Rules suspended, in whole or in part, many of the statutes previously regulating those subjects.[24] These rules have, of course, been amended from time to time by the Pennsylvania Supreme Court on recommendation of its Civil Procedural Rules Committee.

That the purpose of foreign attachment as it originally appeared in Pennsylvania was to secure the entry of appearance of the defendant only is demonstrated by the cases. *See* Linn v. Chapman,[25] Longbotham v. Longbotham,[26] and Raymond v. Leishman,[27] where Justice Mestrezat remarked:

"Foreign attachment under our statute is the equivalent of a summons

15. *See, c. g.*, Alpers v. New Jersey Bell Tel. Co., 403 Pa. 626, 170 A.2d 360 (1961); Fitzgerald v. Caldwell, 1 Yeates 274, 279, rev'd, Add. 119 (1793).

16. 56 U.Pa.L.Rev. 137 (1908).

17. Blackstone also discussed the attachment procedure, in pertinent part, as follows:
    "This is a writ not issuing out of chancery, but out of the court of common pleas, being grounded on the non-appearance of the defendant at the return of the original writ; and thereby the sheriff is commanded to attach him, by taking *gage*, that is, certain of his goods, which he shall forfeit if he doth not appear; or by making him find *safe pledges* or sureties who shall be amerced in case of his nonappearance."
    3 Blackstone, Commentaries 280–81 (1765).

18. Act of June 13, 1836, Pub.L. No. 568, as amended Pa.Stat., tit. 12, §§ 2861–3081 (1967).

19. Pa.Stat., tit. 12, §§ 2711–18 (1967).

20. Pa.Stat., tit. 12, §§ 2741–2838 (1967).

21. Pa.Stat., tit. 12, §§ 3101–36 (1967).

22. *See* Alpers v. New Jersey Bell Tel. Co., 403 Pa. 626, 170 A.2d 360 (1961).

23. Pa.R.Civ.P. 1251–79; 1285–92.

24. As to statute suspended, see Pa.R.Civ. P. 1461, 1462. As to statutes not suspended, see Pa.R.Civ.P. 1411, 1412.

25. 19 Pa.Dist. 282 (Butler Co. C.P. 1910).

26. 18 Pa.County Ct. 460 (Lanc.C.P. 1896).

27. 243 Pa. 64, 89 A. 791 (1914).

for commencement of a personal action. It is a process by which to commence a personal action and compel an appearance. The foundation for the writ is that the defendant is beyond the reach of process and his property within it. The purpose of the statute is to compel the constructive presence in court of the defendant who, by reason of his absence from its jurisdiction without a dwelling place therein, cannot be served with a summons [citations omitted]." [28]

More recently, however, foreign attachment has served the double purpose of compelling an appearance AND rendering the property within the state subject to the demands of creditors. This constitutes a metamorphosis of the foreign attachment procedure. The significance of this metamorphosis as it affects the notion of due process, insofar as due process is defined as the settled usage in England prior to emigration to the colonies, is discussed *infra* at p. 1351. This metamorphosis is demonstrated by the language of the Pennsylvania Superior Court in Sniderman v. Nerone,[29] where the court, speaking through Judge Keller, stated:

"The primary purpose of a foreign attachment is to compel a foreign nonresident to appear within the jurisdiction and defend the plaintiff's claim; a secondary purpose is by attaching the foreign defendant's goods and property to secure a fund or property out of which the plaintiff's claim,

when reduced to judgment, may be paid." [30] [31]

We proceed now to a brief summary of the rules under attack.

A foreign attachment may be issued to attach property of a defendant not exempt from execution.[32] Where the defendant is subject to such action, any person owing a debt to defendant, having property of the defendant in his custody, possession or control, holding fiduciary property in which the defendant has an interest, or holding legal title to property of the defendant may be made a garnishee.[33] The attachment is commenced by filing a praecipe for a writ with the prothonotary which directs the sheriff to attach such items of property of the defendant as are set forth in the praecipe and all other property of the defendant.[34] The prothonotary immediately enters the attachment against the defendant in the judgment index.[35] If the sheriff attaches real property, legal title to which is held by the garnishee, the prothonotary, on praecipe of the plaintiff, immediately enters the attachment against the garnishee in the judgment index.[36] The attachment extends to the property after acquired by the garnishee,[37] may reach a safe deposit box,[38] or real property, including liens and rents,[39] and, in fact, to any form of property not exempt from execution.[40] The rules authorize manual seizure by the sheriff.[41] No bond or security is required of the plaintiff commencing the foreign attachment by the sheriff except for the actual or estimated cost of obtaining possession of the property.[42] Plaintiff

28. *Id.* at 69, 89 A. at 793. *See also* Konopka v. McAteer, 313 Pa. 510, 169 A. 778 (1934) ; Rankin v. Culver, 303 Pa. 401, 154 A. 701 (1931) ; David E. Kennedy, Inc. v. Schleindl, 290 Pa. 38, 137 A. 815 (1927) ; Falk Co. v. American Ry. Express Co., 79 Pa.Super. 99 (1922).

29. 136 Pa.Super. 381, 7 A.2d 496, aff'd per curiam, 336 Pa. 305, 9 A.2d 335 (1939).

30. *Id.* at 385, 7 A.2d at 498.

31. *See also* Marano v. Granata, 151 Pa. Super. 454, 30 A.2d 243 (1943).

32. Pa.R.Civ.P. 1252.

33. Pa.R.Civ.P. 1253.

34. Pa.R.Civ.P. 1255(a).

35. Pa.R.Civ.P. 1255(b).

36. Pa.R.Civ.P. 1255(c).

37. Pa.R.Civ.P. 1258(a).

38. Pa.R.Civ.P. 1259.

39. Pa.R.Civ.P. 1260.

40. Pa.R.Civ.P. 1252.

41. Pa.R.Civ.P. 1261.

42. Pa.R.Civ.P. 1262.

is required to file a complaint setting forth his cause of action but not until five days after the filing of the foreign attachment proceedings.[43] The attachment is implemented by the filing of a garnishee's report, setting forth in detail the property of the defendant in his possession.[44]

■ Foreign attachment is generally considered under both the statutes and the rules as a form of process and not a form of action.[45] As the Goodrich-Amram commentary points out, foreign attachment, until the defendant is served with the complaint, appears or files a bond or security, has many characteristics of a proceeding *in rem*; however, unlike a proceeding purely *in rem*, the attachment affects merely the interest of the defendant in the property attached, and no personal judgment may be rendered against the defendant unless he becomes subject to the jurisdiction of the court *in personam* by service of process upon him or by a voluntary action, such as an appearance or the filing of a bond.[46]

Against that background, Rule 1272 provides for dissolution of attachment only upon:

(1) the entry of bond or security;

(2) the failure of the plaintiff after judgment against the defendant to proceed diligently against the garnishee;

(3) the failure of the plaintiff, after the garnishee has answered interrogatories, to proceed diligently against the garnishee; or

(4) the failure of the plaintiff generally to prosecute the action with due diligence.

Rule 1273 provides that:

"The court on the petition of any person or party, may, at any time after notice and hearing

(1) review the action of the prothonotary in approving or rejecting the bond or security offered;

(2) increase or decrease the amount of any bond or security;

(3) strike off a bond improperly filed; or.

(4) permit the substitution of a bond or security and enter exoneration of a prior bond."

We set these provisions forth in *haec verba* because they represent the first time in the procedure where the defendant may appear and be heard. Until then, everything is done on a purely ministerial basis by the prothonotary and sheriff without notice or hearing. And the scope of the hearing in this instance is limited principally to a determination of the propriety of the *amount* of security.

We have described the foreign attachment history and procedure. We come now to a construction of *Sniadach*.

## IV. SNIADACH—CAN ITS DUE PROCESS IMPORT BE LIMITED TO WAGE GARNISHMENT-TYPE CASES?

The Wisconsin statute struck down by *Sniadach* permitted a creditor to institute legal action by garnishing wages. Under the statute, the clerk of court issues the summons at the request of the creditor's lawyer; the garnishment prior to any hearing follows. In holding that the pre-judgment garnishment procedure violated the fundamental procedures of due process of law, and that no situation requiring special protection to a state or creditor interest was presented by the facts (Mrs. Sniadach was readily amenable to *in personam* jurisdiction), the Supreme Court came down heavily on the fact that:

"We deal here with wages—*a specialized type of property presenting dis-*

43. Pa.R.Civ.P. 1265(a).

44. Pa.R.Civ.P. 1266(a).

45. *See* Goodrich-Amram, Pa.Proc.R.Serv. § 1251–5, at 15 (1962).

46. *Cf.* Ownbey v. Morgan, 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921), describing a different procedure in Delaware.

*tinct problems in our economic system."* [47]

The Court, speaking through Mr. Justice Douglas, discussed at length the hardship which the Wisconsin-type statute imposes on wage earners with families to support, and it referred to the statements by Congressmen who have investigated these matters. Congressman Reuss was cited as referring to the idea of garnishment in advance of judgment as "a most inhuman doctrine". Congressman Sullivan, Chairman of the House Subcommittee on Consumer Affairs, was quoted as stating that:

> "What we know from our study of this problem is that in a vast number of cases the debt is a fraudulent one, saddled on a poor ignorant person who is trapped in an easy credit nightmare, in which he is charged double for something he could not pay for even if the proper price was called for, and then hounded into giving up his pound of flesh, and being fired besides." 114 Cong.Rec. 1832. [48]

After referring to the "enormous" leverage of the creditor on the wage earner, Justice Douglas concluded:

> "The result is that a prejudgment garnishment of the Wisconsin type may as a practical matter drive a wage-earning family to the wall. Where the taking of one's property is so obvious, it needs no extended argument to conclude that absent notice and a prior hearing (cf. Coe v. Armour Fertilizer Works, 237 U.S. 413, 423, 35 S.Ct. 625, 628, 59 L.Ed. 1027) this prejudgment garnishment procedure violates the fundamental principles of due process." [49]

In view of the foregoing language, one's first reaction is to consider *Sniadach* as turning on the "specialized type of property" concept; as being a special application of procedural due process to persons in the marginal or submarginal socio-economic class. This construction can be borne out by an analysis of some of the leading cases which followed in *Sniadach*'s wake.

We turn first to Goldberg v. Kelly. [50] The plaintiff was a New York City resident receiving financial aid under the federally assisted A.F.D.C. program, whose benefits were terminated or were about to be terminated in accordance with the New York procedure without notice or hearing. The Supreme Court held that, under all of the circumstances, due process required an evidentiary hearing before termination of welfare benefits, and that the fact that there is later on a constitutionally fair procedure does not change the result. The Court at one point remarks that "by hypothesis" the welfare recipient is destitute, and that it would be unconscionable to cut off benefits without a prior hearing in the absence of overwhelming considerations to justify it. The court regarded as the "crucial factor" in this context that the termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means to live while he waits. *Sniadach* is relied upon in the court's opinion.

Santiago v. McElroy, [51] emanated from a three-judge court which had before it an attack upon the constitutionality of the distraint procedures of the Pennsylvania Landlord and Tenant Act of 1951, Pa.Stat., tit. 68, § 250.302–313 (1965), authorizing the levy and sale of tenant's goods. The remedy of distress was age-old. As encrusted in the Act, it provided that whenever the landlord concluded that rent was due and owing, either he or his agent was authorized to distrain all property on tenant's premises not statutorily exempt from the levy and to have the goods appraised and then sold at public sale if no replevin action

---

47. 395 U.S. at 340, 89 S.Ct. at 1822 (emphasis added).

48. *Id.* at 341, 89 S.Ct. at 1823.

49. *Id.* at 341–342, 89 S.Ct. at 1822–1823 (footnote omitted).

50. 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed. 2d 287 (1970).

51. 319 F.Supp. 284 (E.D.Pa.1970).

was instituted by the tenant within a five-day period. Judge Joseph S. Lord, III, speaking for the court, found the case to be "indistinguishable" from *Sniadach*. He rejected the notion that distress sales qualified as a time-honored procedure and, after examining the record, found no sufficient evidence of an "extraordinary situation * * * requiring *special* protection to a state or creditor interest". He further found that the statute was not narrowly drawn to meet the unusual condition. The Santiagos, consisting of husband, wife and eight children, were public assistance recipients with no savings.

Swarb v. Lennox [52] was an attack upon the constitutionality of acts of the Pennsylvania General Assembly pertaining to confession of judgment. The procedure permits a debtor to sign an agreement containing a clause authorizing the prothonotary, court clerk or any attorney to appear in any court at any time to confess judgment against the debtor for any unpaid portion of the debt along with various fees and charges. The court recited the exceedingly cumbersome procedure requiring retention of counsel and considerable expense required to open a judgment. The court also considered testimony establishing that: (1) 95% of the judgment notes placed on record in Philadelphia were signed by individuals who did not understand what they were signing; and (2) 96% of confessed judgments in Philadelphia for a given period were against individuals earning less than $10,000 per year. The court relied expressly upon *Sniadach* in holding that the procedure violated the due process requirements of notice and an opportunity to be heard prior to the entry of judgment as to persons earning less than $10,000 per year. One judge of the three-judge court, District Judge Charles Weiner, dissented in part and would apply the Court's ruling to all individuals regardless of income.[52a]

In Laprease v. Raymours Furniture Co.,[53] a three-judge court, relying upon *Sniadach*, invalidated the New York Rules governing procedure in a replevin action which permitted the pre-hearing seizure of the subject matter of the action without the intervention or order of a judicial officer. The three plaintiffs were either welfare recipients or marginal wage-earners whose household furnishings were repossessed by the vendor for alleged failure to make time payments. The court analogized to *Sniadach*:

> "Beds, stoves, mattresses, dishes, tables and other necessaries for ordinary day-to-day living are, like wages in *Sniadach*, a 'specialized type of property presenting distinct problems in our economic system' * * *."

It added:

> "The factual difference that *Sniadach* dealt with an unsecured interest and in these cases the vendors' interests were secured, dissolves before the purchasers' claims that there were no defaults and no right to repossession * * *." [53a]

The applicability of Goldberg v. Kelly and Swarb v. Lennox are limited by their holdings to deprived classes or at least to persons of moderate means. We

---

**52.** 314 F.Supp. 1091 (E.D.Pa.1970), probable jurisdiction noted, 401 U.S. 991, 91 S.Ct. 1220, 28 L.Ed.2d 529 (Filed March 29, 1971).

**52a.** On April 5, 1971, Mr. Justice Brennan issued a temporary stay order of all sales of property: (1) based on confessions of judgment in documents signed by families earning $10,000 or more; and (2) based on confessions of judgment in mortgage documents.

**53.** 315 F.Supp. 716 (N.D.N.Y.1970).

**53a.** *Id.* at 723. *Cf.* Epps v. Cortese, 326 F.Supp. 127 (E.D.Pa., filed March 31, 1971), reaching an opposite result on the constitutionality of a replevin statute. The *Epps* court achieved a different conclusion from *Sniadach*, in part because of the identifiable nature of the property and the existence of the security interest. We note at this point that the case at bar involves an unliquidated claim for tortious conspiracy in which the property attached is not identifiable to the claim —a very different situation from *Epps* and *Laprease*.

know that Mrs. Sniadach's wages were not substantial although there is no indication of what her financial situation was otherwise. *Santiago* and *Laprease* deal on their face with persons of marginal incomes, from public assistance or otherwise. But, as this Court analyzes them, it is difficult to bottom them conceptually on the *Sniadachian* "specialized type of property" concept. And there is no language in either opinion which compels a different result if the persons whose goods are distrained upon or furnishings replevied were affluent. In terms of the due process analysis, why should a different result have been obtained had the plaintiff in *Santiago* been the affluent tenant of a center-city luxury high rise who was temporarily financially distressed, or inadvertently late in payments, or was withholding rent payment because of a genuine dispute as to liability. Would the detention and sale of his household goods under the statutory procedure struck down have been any less offensive? In *Laprease*, would the replevin procedure been more palatable had the defendant whose goods were replevied been a corporation?

With this introduction, we raise the difficult question as to whether *Sniadach* must be interpreted narrowly as a case bottomed upon the "specialized type of property" involved, to wit, wages, or whether it should be given a broader interpretation as a due process case across the board, regardless of the type of property involved or the affluence of the debtor. We are not the first court which has been confronted with the question.

The closest case on point is Black Watch Farms v. Dick,[54] which involved an attack upon the Connecticut general attachment law—a broader enactment even than the Pennsylvania foreign attachment rules, for it permitted attachment without notice or hearing prior to suit against even a Connecticut resident. In upholding the law, Judge Zampano construed *Sniadach* narrowly, limiting its effect to wages.

In a decision filed but days ago, Epps v. Cortese, 326 F.Supp. 127 (E.D.Pa., filed March 31, 1971), a three-judge district court rendered an equally narrow holding of *Sniadach* in refusing to invalidate the Pennsylvania Replevin With Bond Rules which permit the seizure of identifiable property without notice or hearing where a creditor claims reservation of title and default under a conditional sales agreement. The court distinguishes *Laprease* on several grounds but indicates that, if it were not distinguishable, it would nonetheless differ with its holding. There are a number of other cases adopting a strict interpretation of *Sniadach*.[55] However, there is

---

54. 323 F.Supp. 100 (D.Conn.1971).

55. Brunswick Corp. v. J & P, Inc., 424 F.2d 100 (10th Cir. 1970); Fuentes v. Faircloth, 317 F.Supp. 954 (S.D.Fla. 1970), probable jurisdiction noted, 401 U.S. 906, 91 S.Ct. 893, 27 L.Ed.2d 804 (Feb. 22, 1971); American Olean Tile Co. v. Zimmerman, 317 F.Supp. 150 (D. Hawaii 1970); Young v. Ridley, 309 F. Supp. 1308 (D.D.C.1970); Termplan Inc. v. Superior Court, 105 Ariz. 270, 463 P.2d 68 (1969); Andrew Brown Co. v. Painters Warehouse, Inc., 11 Ariz.App. 571, 466 P.2d 790 (1970); Johnston v. Cunningham, 12 Cal.App.3d 123, 90 Cal. Rptr. 487 (1970); Western Bd. of Adjusters, Inc. v. Covina Publishing Co., 9 Cal.App.3d 659, 88 Cal.Rptr. 293 (1970); Michael's Jewelers v. Handy, 6 Conn.Cir. 103, 266 A.2d 904 (1969);

Robinson v. Loyola Foundation, Inc., 236 So.2d 154 (Fla.Ct.App.1970); 300 West 154th St. Realty Co. v. Department of Bldgs., 26 N.Y.2d 538, 311 N.Y.S.2d 899, 260 N.E.2d 534 (1970).

The Supreme Court has not spoken to this area of the law since *Sniadach*. The closest case is Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (filed March 2, 1971), holding that the due process clause of the fourteenth amendment bars a state from denying indigents access to the divorce court solely because of their inability to pay costs and fees, where the Court stated:

"That the hearing required by due process is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property

impressive authority opting for a broader view of *Sniadach* as well.

In this regard, we consider first the case of Klim v. Jones, 315 F.Supp. 109 (N.D.Cal.1970). *Klim* was an action by a boarder against the proprietor and manager of a hotel asserting the unconstitutionality of the California innkeepers lien law. Like other remedies we have been discussing, the innkeepers lien is an ancient remedy. It dates from Roman Law and coursed from there into the common law. Under the innkeepers lien law, all of a boarder's personal property may become subject to the innkeepers lien prior to any hearing in the matter. Judge Levin held the law to be unconstitutionally infirm on *Sniadach* due process grounds for its failure to provide for any sort of hearing prior to the imposition of the innkeepers lien thereunder. It happened that Klim was irregularly employed as a painter, was of limited financial means, and was receiving cash aid from the Department of Social Services of San Francisco on an emergency basis at the time the action was filed. His weekly rental was $10. The action arose when, despite Klim's protestations that no rent was due and owing, he was locked out of his room with his personal belongings still inside. While Judge Levin indicated that the primary impact of the innkeepers lien law appeared to be upon those who were of limited means, he also observed as follows:

"Although recent court opinions have left in doubt whether *Sniadach* was based strictly on due process grounds or whether it was more concerned with the particular type of property discussed there, this court

interest, except for *extraordinary situations* where some valid governmental interest is at stake that justifies postponing the hearing until after the event." (91 S.Ct. at 786) [emphasis added].

56. 315 F.Supp. at 122 (footnote omitted).

57. 44 Wis.2d at 718, 172 N.W.2d at 23. In Gerovac v. Hribar Trucking, Inc., 43 Wis.2d 328, 168 N.W.2d 863 (1969), the

regards *Sniadach* as standing inescapably on constitutional principles."[56]

. For the fact is that the innkeepers lien law affects rich as well as poor. Judge Levin also pointed out that while wage garnishment, as in *Sniadach*, applies only to wages and only to a portion thereof, leaving the debtor's other property unencumbered, under the innkeeper's lien law *all* of the boarder's possessions may be denied him if he keeps them in his lodgings.

A more trenchant statement of this view is found in Larson v. Fetherston, 44 Wis.2d 712, 172 N.W.2d 20 (1969). In this case, the Wisconsin Supreme Court, which had been reversed in *Sniadach*, was called upon to consider the applicability of the *Sniadach* decision invalidating the Wisconsin pre-judgment garnishment statute to a case involving a dispute between parties to a substantial commercial transaction. The sums garnished totalled over $31,000. The respondents sought to avoid dismissal of their garnishment actions by arguing that the *Sniadach* decision was limited in scope, and should be applied only to garnishment of wages. Speaking through Mr. Justice Hanley, a unanimous Wisconsin Supreme Court held:

"Although the majority opinion in *Sniadach* makes considerable reference to the hardship of the unconstitutional procedure upon the wage earner, we think that no valid distinction can be made between garnishment of wages and that of other property. Clearly, a due process violation should not depend upon the type of property being subjected to the procedure.[57]

Wisconsin Supreme Court spoke again on the subject. Justice Hansen pointed to the concurring opinion of Mr. Justice Harlan in the *Sniadach* case:
"The writer, for himself only, concludes that the garnishment action here involved might survive the majority decision, but would be torpedoed by the logic of the concurring opinion." *Id.* at 334 n.5, 168 N.W.2d at 866 n.5.

Jones Press Inc. v. Motor Travel Services, Inc.[58] is a unanimous decision of the Minnesota Supreme Court invalidating a general garnishment statute where the case at bar involved garnishment of accounts receivable. The court stated:

> "We have great difficulty in distinguishing between the impounding of wages without notice and an opportunity to be heard and garnishing accounts receivable under similar conditions. The hardship and injustice stressed in the majority opinion in Sniadach are equally applicable to the laborer, artisan, or merchant, whose livelihood depends on selling customers his services or his goods. It seems to us that the fortuity of a debtor's being self-employed should not insulate a creditor from according the debtor procedural due process. * * * *No rational distinction can be drawn between a livelihood dependent on wages and one derived from the sale of services and goods if the rationale of the Sniadach case is based on the policy of protecting a breadwinner from the harassment of creditors. If, as we have indicated, that decision is premised on the broader constitutional concept of notice and an opportunity to be heard, the rule should apply to the garnishment of all property.*" [emphasis added].[59]

Against this background, one restates the question as follows: Is procedural due process divisible? May it be the subject of a dual standard, dependent upon the financial circumstances of the party whose property is seized without notice or hearing? [60]

The question is heightened by the observation that Sniadach was decided on due process, not on equal protection,[61] grounds.

Proponents of the narrower construction of Sniadach might well say that this is an unfair question. For one essence of the Sniadach holding is that, while a procedure may be fair (and fairness is the essence of due process) as to a defendant who has the means to combat it or to "roll with the punches", it may not be when the seizure of one's property deals a staggering or knockout blow. One cannot quarrel with this reasoning as far as it goes. The problem with it is that the impact of seizure of property without notice or hearing may be as great or greater upon a defendant not in the wage-earning or marginal socio economic class.

In the instant case, without notice or hearing, $75,000 in cash was tied up in one fell swoop. Counsel for Forbes represents that this sum represents 40% of its assets. Forbes is in the financing business; counsel asserts that, pending dissolution of the attachment, its business is measurably paralyzed. In construing the validity of the Delaware foreign attachment statute in Ownbey v. Morgan,[62] the Supreme Court said:

> "this [the reasonableness of the requirement and its consistency with the established modes of administering justice] must be determined not alone with reference to a case of peculiar

58. 286 Minn. 205, 176 N.W.2d 87 (1970).

59. *Id.* at —, 176 N.W.2d at 90–91. *See also* Mihans v. Municipal Court, 7 Cal. App.3d 479, 87 Cal.Rptr. 17 (1970), invalidating a California statute permitting the issuance of a prejudgment writ of immediate possession by a landlord pending hearing on the merits, on *Sniadachian* grounds.

60. *Cf.* Weiner, J., dissenting in part in Swarb v. Lennox, *supra,* and the stay order of Mr. Justice Brennan pending appeal (see note 52a, *supra*) on the question of whether the validity of confession of judgment in Pennsylvania depends upon the income of the debtor. In this regard we note that the *Swarb* majority's refusal to extend its holding to persons or families with incomes of more than $10,000 a year was based upon evidentiary, not constitutional, principles.

61. One case in the line discussed by this opinion also went off on equal protection grounds. Mihans v. Municipal Court, 7 Cal.App.3d 479, 87 Cal.Rptr. 17 (1970).

62. 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 827 (1921).

hardship arising out of exceptional circumstances, but with respect to the general effect and operation of the system of procedure established by the statutes." [63]

In many a case, the attaching creditor could be either exceptionally astute or exceptionally lucky and manage to attach all of a debtor's assets. Even an affluent debtor would be gravely disadvantaged under these circumstances.

An affluent debtor can, of course, obtain counsel to contest the proceedings. However, under the foreign attachment law, there are only two meaningful ways to dissolve the attachment: (1) by posting security; and (2) by winning the suit.

With respect to the former, it is true that Forbes could post a bond. It has asserted that the cost would be substantial but concedes it to be affordable. The problem is that posting a bond involves more than paying a premium. The Court takes judicial notice of the fact that surety companies, more often than not, require security for the posting of a bond, which may take the form of cash or other property. The existence of the bond obligation would have to appear on the accounting records of the corporation and, in many cases, would impair its credit standing. Moreover, the Pennsylvania Foreign Attachment Law is not limited to attaching the property of corporations. While concededly it has its greatest applicability in the field of non-consumer commercial transactions, nonetheless, the range of potential defendants within its orbit runs the societal gamut. Any debtor might be the subject of a foreign attachment action and have the bulk of his assets tide up without notice or hearing.

It is true that the debtor may have the attachment dissolved by being successful in the law suit. Suffice it to say that in a contemporary metropolitan area, the court backlog may prevent this method of dissolution for several years. In this regard, it should be noted that any doubts that *temporary* deprivation of property can constitute a denial of due process have been laid to rest by *Sniadach*.

One searches in vain for a satisfactory definition of procedural due process. For example:

"In its procedural aspect, the constitutional guaranty of due process of law assures to every person his day in court and the benefit of the general law, and means that there can be no proceeding against life, liberty, or property without observance of those general rules established in our system of jurisprudence for the security of private rights." [64]

Essentially, due process involves a balancing procedure, pursuant to which the Court must consider:

"the precise nature of the interest that has been adversely affected, the manner in which this was done, the reasons for doing it, the available alternatives to the procedure that was followed * * *, the balance of hurt complained of and good accomplished." [65]

In the case of Goldberg v. Kelly, *supra*, for instance, the Supreme Court held that the extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be condemned to suffer grievous loss, and depends on whether the recipient's interest in avoiding the loss outweighs the governmental interest in summary adjudication.[66] The notion that fundamental fairness must be accorded the litigants and that the determination of what is fundamentally fair inevitably

---

63. *Id.* at 103–104, 41 S.Ct. at 435.

64. 16A C.J.S. Constitutional Law § 569 (4)a (1956). *See* Truax v. Corrigan, 257 U.S. 312, 332, 42 S.Ct. 124, 66 L.Ed. 254 (1921).

65. Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 163, 71 S.Ct. 624, 644, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

66. *See also* Cafeteria and Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

involves a weighing and balancing of their respective interests permeates the procedural due process cases, including *Sniadach*, where it took the form of the Court's inquiry as to whether a special state or creditor interest outweighs the detriment to the debtor. In the next section of this opinion, we shall discuss the creditor's side of the coin—and whether, in *Sniadachian* language, a special state or creditor interest requiring protection is presented by the facts.

In this section of our opinion, our discussion has been directed to the impact upon the debtor. As Judge Levin observed in *Klim*, under the Wisconsin statute only a portion of the debtor's wages are garnished. However, under the innkeepers lien law all of the debtor's possessions may be attached. And, under the Pennsylvania Foreign Attachment Law, if the creditor is lucky enough or astute enough, he too may attach virtually all of the alleged debtor's property.

We have discussed this possibility apropos of the situation of Forbes. We made no finding that 40% of Forbes' assets have been tied up, having heard no actual testimony on that point, only the representations of counsel. However, assuming that these representations are even approximately accurate, can it be gainsaid that Forbes Leasing Corporation is proportionately any better off than Mrs. Sniadach? In fact, it may be far worse off.

In view of all the foregoing analyses, we express grave doubt as to whether *Sniadach* may be read only as a poor debtor or consumer case, as opposed to a due process case across the board. Full resolution of the question thus posed depends upon whether there is a sufficient state or creditor interest to justify the foreign attachment rules and whether they are sufficiently narrowly drawn to satisfy such interest.

## V. IS THERE A SUFFICIENT STATE OR CREDITOR INTEREST TO JUSTIFY THE FOREIGN ATTACHMENT RULES? ARE THE RULES NARROWLY ENOUGH DRAWN?

We have adverted on several occasions to the holding in *Sniadach* that a prejudgment garnishment-type statute may be constitutionally maintained if there is an "extraordinary situation * * * requiring special protection to a state or creditor interest" and, "the statute [is] narrowly drawn to meet the unusual condition." [67]

■■ This Court agrees with Lebowitz that the state has a valid interest in protecting its residents so that they may assert claims against non-residents doing business within the state's borders without having to travel elsewhere. The first area of concern is the amenability of the defendant to personal service. However, where a defendant, though a non-registered corporation or a non-resident individual, is doing business in Pennsylvania, he or it is subject to the Long-Arm Statutes,[68] and therefore to personal service.

Pa.Stat., tit. 15, § 2011 (1961) is a provision of the Pennsylvania Business Corporation Law allowing for service of process against a foreign business corporation doing business in Pennsylvania by serving the Secretary of the Commonwealth who, in turn, serves the corporation by mailing the legal process to its registered office.[69] The Act of July 1,

---

67. The Court does not define "state interest" in this context. However, from the cases it cites in juxtaposition to the phrase, it would seem that a state interest would be such as that involved in Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), sustaining pre-hearing seizure of misbranded articles prior to a hearing when the Administrator had probable cause to believe the articles to be dangerous to health; and Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552,

91 L.Ed. 2030 (1947); and Coffin Bros. & Co. v. Bennett, 277 U.S. 29, 48 S.Ct. 422, 72 L.Ed. 768 (1928), involving pre-hearing actions in connection with the management of banks. The state could, of course, also have an interest in protecting a creditor's legal rights.

68. Pa.Stat., tit. 15, § 2011 (1961); Pa. Stat., tit. 12, § 342, 1970 Pa.Legis.Serv. 320 (Act No. 152, July 1, 1970).

69. *See* Wenzel v. Morris Distributing Co., 439 Pa. 364, 266 A.2d 662 (1970).

1970, Act No. 152, constitutes a broadening of this so-called Long-Arm Statute and makes it applicable to non-resident individuals as well as corporations and to causes of action arising outside Pennsylvania, as well as those arising therein.

It is undisputed that the defendant corporation had an office and a telephone in Philadelphia. The face of the complaint reveals that very substantial business, including the obtaining of a line of credit in excess of a quarter of a million dollars, was being conducted here. There can be no question but that Forbes was doing business in Pennsylvania and was amenable to the reach of the Long-Arm Statute and that the plaintiff need not travel to another forum to sue. Forbes has entered a general appearance through counsel.

Having concluded that there is a valid state or creditor interest which inheres in the rules, i. e., the protection of the right of a creditor of a party doing business in Pennsylvania to sue him in Pennsylvania if he can find and attach debtor's property in Pennsylvania, without having to travel to another forum, it would nonetheless appear in the language of *Sniadach*, that insofar as *this* state policy is concerned, the rules are not sufficiently narrowly drawn, for they do not exclude from their orbit situations where, as here, the defendant is within the reach of the Long-Arm Statute.

Justification of state policy in this situation must, therefore, rest upon the second purpose of the foreign attachment rules, which we have referred to: the securing of execution in advance of judgment by freezing property subject to the attachment until the conclusion of the suit and rendering it available for satisfaction of the judgment obtained.

Is this a valid state policy in terms of protection of creditors? Certainly, there is an enormous creditor interest in this policy. Equally certain, there are many, many cases where the protection of this interest is bona fide. There are countless debtors who will remove property from sight and from the State or dissipate it in order to avoid execution. Under such circumstances, state policy in protecting creditors by means of foreign attachment is valid. The question then becomes as to whether: (1) the rules are sufficiently narrowly drawn to protect this interest; and (2) the creditor interest is not attenuated by auxiliary remedies available to a creditor or (3) far outweighed by the countervailing interests of the debtor.

If the would-be foreign attachment creditor were relegated to the status of an ordinary creditor, he would be required to sue, obtain his judgment, and then discover a fund upon which to execute. If he were able to uncover the fund in Pennsylvania, he could execute on it in Pennsylvania. In the present case, incidentally, plaintiff direly predicts that Forbes will remove its assets from Pennsylvania, but that is speculation. It may, and yet it may not. If assets in Pennsylvania are unavailable, the plaintiff can resort either to the Uniform Enforcement of Judgments Act [70] or to su-

70. There are two such acts. The 1948 Act was adopted by the following states:
Ark.—1949—Ark.Stat. §§ 29–801—29–818
Ill.—1951—S.H.A., ch. 77, §§ 88–105
Mo.—1951—V.A.M.S. § 511.760
Neb.—1949—R.R.S. §§ 25–1587—25–15, 104
Oregon—1955—Ore.Rev.Stat. 24.010–24.180
Wash.—1953—R.C.W.A. 6.36.010–6.36.910
Wis.—1949—Wis.Stat. § 270.96
Wyo.—1949—Wyo.Stat. §§ 1–460—1–477.
The 1964 revision, which adopts the federal practice and provides a more speedy and economical method of enforcing foreign judgments, has been adopted by:
Pa.—1965—Pa.Stat., tit. 12, §§ 921–928
Wis.—1965—Wis.Stat. § 270.96
Col.—1969—Col.Rev.Stat. §§ 77–13–1—77–13–8
N.Y.—1970—C.P.L.R. §§ 5401–08.

ing on the judgment in the sister state. The latter is a commonplace proceeding and is not necessarily difficult. As long as the full faith and credit clause remains, the practice of suing on judgments in a sister state will be a common device in aid of execution. In the year 1971, where communication is instant and transportation is high-speed, the boundaries between states are traversed in financial and legal transactions millions of times daily with facility and dispatch. But, to be sure, it is cumbersome and annoying to have to seek execution in a sister state.

On the other hand, consider the damage to the debtor. Notwithstanding the existence of what may be a meritorious defense, he is subject to having his property tied up instantly and for years. He is remediless unless he posts a bond, in connection with which he may not only be required to advance a substantial premium, but also to post security and impair his credit. The leverage is instant. He is entitled to a reduction of the garnished sum or of security only if he can show that the possible judgment is less than the amount attached. All the plaintiff need show is a colorable claim. He is not even required to post a bond to protect the defendant. In view of the enormous detrimental impact which such pre-notice and hearing seizure, not even curable by notice and hearing, may have on the business of a debtor, it could be concluded that the interest of the debtor in being free from this type of seizure outweighs the state or creditor interest in protecting the plaintiff, or at least that the rules are not sufficiently narrowly drawn to protect the valid creditor interest alone. The broad sweep of the rules encompasses within its grasp virtually every type of claim, every type of property, and every type of defendant without procedural safeguard. *Cf.* Laprease v. Raymours, *supra*, where the court stated, at p. 723:

"The statute, giving the right to repossess without a hearing, is not 'narrowly drawn' to meet special situations and circumstances but covers any replevin situation."

One situation to which the applicability of the rules could not be assailed is that contemplated by the Pennsylvania Fraudulent Debtors Attachment, Pa.R.Civ.P. 1286, which provides for pre-judgment attachment when it is alleged that defendant, with intent to defraud the plaintiff:

"(1) has removed or is about to remove property from the jurisdiction of the court;

(2) has concealed or is about to conceal property;

(3) has transferred or is about to transfer property; or

(4) has concealed himself within, absconded, or absented himself from the Commonwealth."

Significantly, pursuant to Pa.R.Civ.P. 1287, the plaintiff, in a fraudulent debtor's attachment proceeding, is compelled to file bond in either double the amount claimed or double the estimated value of the property to be attached, with security approved by the prothonotary, conditioned that the plaintiff shall pay the defendant or any garnishee all legal costs, fees and damages which they may sustain by reason of the attachment *if it is* adjudged either that the cause of action or the ground for attachment is not established. There is no such language in the foreign attachment rules.

The interest of a creditor against a potentially absconding or potentially insolvent debtor could be protected by drawing the foreign attachment rules more narrowly, much in the way that the fraudulent debtor's attachment rules are drawn. The interests of the debtor could be more adequately protected by requiring the posting of bond.[71]

---

71. The presence of a bond requirement protecting the debtor was one factor which influenced the court in Epps v. Cortese, *supra*, to reject the constitutional challenge to the Pennsylvania Rules of Civil Procedure pertaining to replevin with bond.

Thus we express grave doubt, as well, as to whether the foreign attachment rules are sufficiently narrowly drawn to protect a valid state or creditor interest.

The Court's forebodings have been presaged by several recent case notes published in the law reviews. In Attachment and Garnishment, 68 Mich.L. Rev. 986, 1004 (1970), the commentator there remarked as follows:

"In order for a court to hold that prejudgment attachment of tangible property unconstitutionally deprives a defendant of a protected property interest, the court must be persuaded that the alleged debtor's interests outweigh the substantial public concerns supporting seizure.

\*      \*      \*      \*      \*      \*

The chief public interests advanced in support of prejudgment foreign attachment are the state's right to control controversies arising within its borders and the state's interest in providing the protection of state courts to its citizens in their dealings with nonresidents. The use of prejudgment foreign-attachment procedures to achieve these goals, however, has been severely criticized in light of modern developments in the law relating to personal jurisdiction. The critics contend that, since long-arm statutes make personal jurisdiction generally available in cases in which the nonresident defendant has sufficient contacts with the forum state to create a genuine state interest, quasi in rem jurisdiction established by prejudgment foreign attachment is likely to be used only when the state has no legitimate interest in the dispute. If this criticism is valid, assertion of jurisdiction by foreign attachment advances no state interests that are not already fully protected. Hence, the determination of the constitutionality of various forms of prejudgment attachment and garnishment should be unaffected by the fact that the attach-

ment is used to establish jurisdiction, at least if there are long-arm statutes that make personal jurisdiction readily available."

See also an article by Carrington entitled The Modern Utility of Quasi In Rem Jurisdiction, 76 Harv.L.Rev. 303 (1962), where the author pointed out:

"At the most the suggestion argues only for quasi in rem commencement conditioned upon a showing by the plaintiff that such exercise of jurisdiction is necessary to avoid unnecessary litigation or absconding.";

and a note at 1970 Wis.L.Rev. 181, 190, where the writer observes:

"Considering the direction taken in *Sniadach,* it is questionable whether any type of prejudgment garnishment will withstand a due process challenge."

Neither are our doubts removed by reference to the honored notion of due process as the "settled usage both in England and in this country", Hurtado v. California, 110 U.S. 516, 528, 4 S.Ct. 111, 117, 28 L.Ed. 232 (1884), or, put differently.

"those settled usages and modes of proceeding existing in the common and statue [sic] law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition, by having been acted on by them after the settlement of this country." Murrays' Lessee v. Hoboken Land & Improvement Co.[72]

For, as we have seen above,[73] the settled usage in England was that attachment was a means of securing judgment over the person alone, and not a means to secure execution in advance. Even the lower court opinion in McInnes v. McKay, 127 Me. 110, 141 A. 699 (1928), aff'd per curiam, 279 U.S. 820, 49 S.Ct. 344, 73 L.Ed. 975 (1929), the case upon which our decision not to invalidate the

---

**72.** 59 U.S. (18 How.) 272, 277, 15 L.Ed. 372 (1856).

**73.** *See* p. 1338, *supra.*

foreign attachment rules must ultimately turn, points this out:

" 'The practice of attaching the effects of a defendant, and holding them to satisfy a judgment, which the plaintiff may recover, when perhaps judgment may be for the defendant, is unknown to the common law, and is founded on our statute law, explained by an usage founded in the ordinances in force under the colonial charter.' [Parsons, C. J., in Bond v. Ward, 7 Mass., 123, 128, 5 Am.Dec. 28 (1810)]

For some time under that charter attachment was, as it was at common law, merely a distress, a seizing of his chattels, to compel the defendant to appear when he did not appear on summons and answer, his chattels being restored to him when he appeared and forfeited when he did not." [74]

To summarize: we have expressed our grave doubts as to whether Sniadach can be narrowly read, and as to whether the Pennsylvania foreign attachment procedure is sufficiently narrowly drawn to pass procedural due process muster under the broader interpretation of Sniadach. "Grave doubts" are, of course, not helpful to Forbes, which seeks to dissolve the attachment; nor are they helpful to future litigants seeking guidance. But we are a lower court and are faced with precedent which prevents invalidation of the foreign attachment rules, even were we to affirmatively resolve those "grave doubts" in Forbes' favor. We turn to that precedent now.

## VI. THE APPARENT VITALITY OF OWNBEY v. MORGAN AND Mc-KAY v. McINNES

In the Sniadach opinion, Mr. Justice Douglas, speaking for the Court, made reference to two older Supreme Court cases [75] upholding prejudgment and hearing attachment procedures against constitutional attack:

"Such summary procedure may well meet the requirements of due process in extraordinary situations Cf. Fahey v. Mallonee, 332 U.S. 245, 253–254, 67 S.Ct. 1552, 1554–1556, 91 L.Ed. 2030; Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 598–600, 70 S.Ct. 870, 872–873, 94 L.Ed. 1088; Ownbey v. Morgan, 256 U.S. 94, 110–112, 41 S.Ct. 433, 437–438, 65 L.Ed. 837; Coffin Bros. & Co. v. Bennett, 277 U.S. 29, 31, 48 S.Ct. 422, 423, 72 L.Ed. 768. But in the present case no situation requiring special protection to a state or creditor interest is presented by the facts; nor is the Wisconsin statute narrowly drawn to meet any such unusual condition." [emphasis added], 395 U.S. at 339, 89 S.Ct. at 1821;

and: "A procedural rule that may satisfy due process

for attachments in general, see McKay v. McInnes, 279 U.S. 820, 49 S.Ct. 344, 73 L.Ed. 975, does not necessarily satisfy procedural due process in every case." [emphasis added]. 395 U.S. at 340, 89 S.Ct. at 1822.

Ownbey was an action brought by foreign attachment proceedings in the State of Delaware, under which the sheriff attached 33,000 shares of stock owned by defendant, a Colorado resident, in a Delaware corporation without notice or hearing.

The then Delaware foreign attachment procedure was unusual. It prevented the entry of appearance and defense, except by corporate defendants, without the entering of special bail. On the other

---

74. 127 Me. at 114, 141 A. at 701. The statute involved in McKay, like the one involved in Black Watch Farms v. Dick, supra, was a general attachment statute, common to the New England states which have been referred to as "creditor states". See 38 Yale L.J. 376 (1929). According to the Maine Supreme Court, the procedure was metamorphosized there into one securing execution in advance of judgment in 1701. In Pennsylvania, the metamorphosis apparently occurred much later.

75. McKay v. McInnes, 279 U.S. 820, 49 S.Ct. 344, 73 L.Ed. 975 (1929); Ownbey v. Morgan, 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921).

hand, any judgment entered pursuant to the statute was not *in personam* and was valid only against the property attached.[75a] The Supreme Court upheld the Delaware statute against due process attack, stating, *inter alia*:

"The due process clause does not impose upon the states a duty to establish ideal systems for the administration of justice, with every modern improvement and with provision against every possible hardship that may befall. * * * But a property owner who absents himself from the territorial jurisdiction of a state, leaving his property within it, must be deemed ex necessitate to consent that the state may subject such property to judicial process to answer demands made against him in his absence, according to any practicable method that reasonably may be adopted. A procedure customarily employed, long before the Revolution, in the commercial metropolis of England, and generally adopted by the states as suited to their circumstances and needs, cannot be deemed inconsistent with due process of law, even if it be taken with its ancient incident of requiring security from a defendant who after seizure of his property comes within the jurisdiction and seeks to interpose a defense. * * *

However desirable it is that the old forms of procedure be improved with the progress of time, it cannot rightly be said that the Fourteenth Amendment furnishes a universal and self-executing remedy. * * * Neither does it, as we think, require a state to relieve the hardship of an ancient and familiar method of procedure by dispensing with the exaction of special security from an appearing defendant in foreign attachment." 256 U.S. at 110–112, 41 S.Ct. at 438.

In McKay v. McInnes, *supra*, the Supreme Court wrote no opinion. It simply upheld the constitutionality of Maine's general attachment law against a procedural due process attack "on the authority of Ownbey v. Morgan." The Maine attachment practice was like the Connecticut practice which we have discussed. It authorized attachment without notice or hearing in any civil action and was not limited to non-residents. Under the Maine procedure, the attachment continues until thirty days after judgment.

The manner in which the Supreme Court cites *Ownbey* and *McKay* is interesting. *Ownbey* is cited with a "cf.", whereas the *McKay* citation is preceded by the word "see". This factor heightens the central question in the case at bar: does *Sniadach* affirm *Ownbey* and *McKay*?

Certainly, they are not expressly affirmed. But, at least, however, their vitality has been recognized.[76] The thrust of the analysis contained in this opinion is directed to the theory that, were it to have *Ownbey* and *McKay* before it directly today, the United States Supreme Court might well decide them differently. In view, however, of the language of *Sniadach*, which, at least, recognizes the vitality of *Ownbey* and *McKay*, even if it does not impliedly approve of them, a United States District Judge is not at liberty to ignore their precedential effect. In view of the increasing volume of litigation in this field, there is every reason to believe that the Supreme Court will soon have an opportunity to rule upon and reconsider, if it wishes, the doctrine of *Ownbey* and *McKay*. In view, then, of the references in *Sniadach* to *Ownbey* and *McKay*, we hold that the Pennsylvania foreign attachment rules are valid.[77]

**75a.** According to the Supreme Court opinion, this procedure was changed by the Delaware legislature so as to permit appearance and defense without the entry of special bail while the appeal was pending. 256 U.S. at 106, 41 S.Ct. at 436.

**76.** The same conclusion was reached by Judge Zampano in Black Watch Farms v. Dick, *supra*.

**77.** Forbes has urged upon us that the seizure of its property pursuant to the writ of foreign attachment constitutes an

Forbes has ingeniously argued that, even were we to conclude that the foreign attachment rules do not violate the fourteenth amendment due process, we can conclude that they violate fifth amendment due process for the reason that Rule 64 of the Federal Rules of Civil Procedure in effect "adopts" the Pennsylvania foreign attachment rules as the federal rules for purposes of a suit removed here on diversity grounds. The simple answer to this contention is that there is, under the cases, no difference between the fifth and fourteenth amendment due process.[78]

## VII. SHOULD THE ATTACHMENT BE DISSOLVED ON THE GROUND OF EQUITABLE ESTOPPEL?

Forbes has asserted, as an additional ground for its motion to dissolve the foreign attachment, the ground of equitable estoppel.

Prior to 1967, a foreign attachment could be effected upon a foreign corporation, whether or not that corporation was registered in Pennsylvania. In 1967, the rule was amended so that a foreign corporation which is registered can no longer have its property attached. Pa.R.Civ.P. 1252(3). Forbes asserts that its failure to be presently registered is due solely to the failure of plaintiff Lebowitz, as its president, to effect registration. It refers to Lebowitz' employment agreement, which provides in paragraph 2 as follows:

"2. As President, LEBOWITZ shall be resonsible [sic] for and his duties shall include all phases of activities of the CORPORATION and in the fulfillment thereof, shall develop sources of funds for the CORPORATION's leasing program; organize a business promotion program; establish procedures for credit control and protection of the security interest of the CORPORATION with regard to leases and loans made by the CORPORATION; provide for the maintenance of adequate and customary system of books of account, records and preservation of documents relating to the business of the CORPORATION: and otherwise undertake all other steps customary, necessary or desirable for the sound and efficient operation of a leasing and financing business organization."

illegal seizure without probable cause or warrant in violation of the fourth amendment, citing to Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. Seatle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); and Laprease v. Raymour Furniture Co., *supra*. It is patent that there was no entry onto Forbes' physical premises or any invasion of anything touching one's physical person. We do not deem Fourth Amendment allegations to be grounds for dissolving the attachment.

Forbes has also urged that the foreign attachment procedure violates Article Four, Section 2, Clause 1 of the Constitution which provides that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states. In essence, Forbes contends that this clause means that a state cannot deal with a person outside its borders in a different manner from those within its borders. Forbes argues that the foreign attachment rules impose different treatment upon non-residents than they do upon residents, even though both may be subject to *in personam* jurisdiction, either by virtue of the Pennsylvania rules or the long-arm statute. The problem with that argument is that it has been held consistently that corporations are not citizens within the meaning of Art. 4, § 2. Hemphill v. Orloff, 277 U.S. 537, 48 S.Ct. 577, 72 L.Ed. 978 (1928); Waters-Pierce Oil Co. v. Texas, 177 U.S. 28, 45, 20 S.Ct. 518, 44 L.Ed. 657 (1900); Norfolk & W. R. R. v. Pennsylvania, 136 U.S. 114, 118, 10 S.Ct. 958, 34 L.Ed. 394 (1890); Paul v. Virginia, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869); Augusta Bank v. Earle, 38 U.S. (13 Pet.) 519, 10 L.Ed. 274 (1839). Therefore, we cannot quash the attachment on this ground.

78. Bowles v. Willingham, 321 U.S. 503, 518, 64 S.Ct. 641, 88 L.Ed. 892 (1944); Foley Securities Corp. v. Commissioner, 106 F.2d 731, 736 (8th Cir. 1939).

From this contractual provision, Forbes asserts that:

> "Because 'Lebowitz \* \* \* [was] responsible for and his duties \* \* \* include[d] all phases of activities of the corporation \* \* \*', Lebowitz should have registered Forbes"

Forbes further contends that: (1) having failed to effect the registration, Lebowitz now seeks to utilize a procedure that would be unavailable to him had he complied with his obligation; and (2) having sought the equity jurisdiction of the Court and having caused a writ of foreign attachment to issue thereunder, Lebowitz comes to the Court with unclean hands seeking to gain from his own nonfeasance. At the argument on the motion, Forbes did not assert that it had evidence that the failure to register was a deliberate one, conceived with a view to instituting an action by way of a foreign attachment in the event of a falling out between the parties.

The estoppel theory is also an ingenious one. It's novelty, however, has apparently inveighed against the finding of a case on point, either pro or con. We hold that the doctrine of equitable estoppel is not applicable to these facts. We do not agree that the contractual provision cited to is sufficient to impose the duty to effect registration upon Lebowitz, who is a layman; if it did, it imposed it upon him in his capacity as a corporate officer, not as an individual.

Forbes relies upon two cases. The first is Lawrence Warehouse Co. v. Menary, 143 F.Supp. 883 (S.D.Iowa 1956), where a warehouseman was not permitted to sue guarantors of notes covering beef carcasses within his warehouse, when he in breach of contract previously released the carcasses and made possible a theft of the goods. The other is Tempo Music, Inc. v. Myers, 407 F.2d 503 (4th Cir. 1969), where a licensing agency for composers, authors, and publishers which failed to comply with a proprietor's request for a list of its protected compositions was held to be estopped from asserting infringement against that same proprietor.

We agree with plaintiff that these cases can be distinguished on several grounds:

1. In both cases, the wrongful conduct of the plaintiff gave rise to the cause of action he later attempted to sue upon. In this case, Lebowitz' cause of action did not arise from the registration or nonregistration of Forbes as a foreign corporation, but from the alleged breach of contract by Forbes.

2. Equitable estoppel operates to bar one with unclean hands from asserting a cause of action, not from selecting how a valid cause of action could be brought.

3. Forbes must show reliance on Lebowitz' alleged duty to register Forbes, an allegation which Forbes did not make. Brown v. City of Pittsburgh, 409 Pa. 357, 186 A.2d 399 (1962); Sunseri v. Sunseri, 358 Pa. 1, 55 A.2d 370 (1947); Northwestern Nat'l Bank v. Commonwealth, 345 Pa. 192, 27 A.2d 20 (1942).

Accordingly, we conclude that the doctrine of equitable estoppel is not applicable and that the foreign attachment cannot be quashed on that ground.

## VIII. CONCLUSION

The motion to quash the foreign attachments which, in view of the foregoing analysis, we deny, was based upon constitutional and equitable estoppel grounds. The motion does not contain an averment that the attachments, if legally valid, were excessive. If counsel for Forbes in proper form applies, we will treat the motion to quash as a motion to reduce the attachments and hold a hearing thereon, at which time we will determine whether the amount attached is inequitable when measured against the probable recovery in the case.